Present:  All the Justices


JENS SOERING

OPINION BY JUSTICE A. CHRISTIAN COMPTON

v.  Record No. 971647                April 17, 1998

GEORGE DEEDS, WARDEN, KEEN
MOUNTAIN CORRECTIONAL CENTER


FROM THE CIRCUIT COURT OF BEDFORD COUNTY
William W. Sweeney, Judge


Petitioner Jens Soering was convicted in 1990 by a jury in the Circuit Court of Bedford County of two counts of first degree murder for the 1985 killings of Derek Haysom and Nancy Haysom in their Bedford County home near Lynchburg.  Soering is being detained by the respondent under two terms of life imprisonment for the murders.

In 1995, the convict filed a petition for a writ of habeas corpus invoking the original jurisdiction of this Court.  In August 1996, the Court, pursuant to Code § 8.01-657, awarded the petitioner a writ of habeas corpus returnable to the Circuit Court of Bedford County for determination of the issue "whether the Commonwealth withheld from the defense exculpatory evidence as alleged in claim V" of the amended petition.  The Court dismissed the remaining habeas allegations.  Claim Five of the petition alleges:  "Soering's conviction should be reversed due

to the prosecution's withholding of Brady material from the defense at his original trial."

In December 1996, the habeas judge, who had presided over the criminal trial, conducted an evidentiary hearing on the issue presented. In a June 1997 order, incorporating a 13-page memorandum opinion, the court determined the convict's claim is without merit. The matter is before us for review.

Initially, the evidence adduced during the criminal trial will be summarized. The murder victims were the parents of Elizabeth Haysom, Soering's girlfriend and lover. In 1984, Soering and Elizabeth were undergraduate students at the University of Virginia, both attending under academic scholarships. A friendship between the pair developed into an infatuation. Elizabeth's parents opposed their daughter's relationship with Soering; this infuriated him. During this time, she also had "feelings" of "anger" as well as "resentment" and "hatred" toward her parents.

During the latter part of 1984 and early 1985, Soering and Elizabeth began discussing "a lot of ideas about how [her parents] might die." On Friday, March 29, 1985, the students traveled in a rented vehicle from Charlottesville to Washington, D.C., and "checked into" a hotel.

On Saturday, "it suddenly became real, we were going to conspire and commit murder," according to Elizabeth, who was a

2

prosecution witness at Soering's trial. The pair made elaborate plans to establish an alibi to cover Soering's trip from Washington to her parents' home for the purpose of killing them. He purchased a knife before he departed Washington alone on Saturday afternoon. She remained, and walked around Washington in a drug-induced "haze."

Later that night, Elizabeth found Soering on a Washington street, near where they "agreed to meet," sitting in the rented vehicle with a bloody bedspread "draped over him." He told her he had killed her parents.

The victims' bodies were discovered during the day on Wednesday, April 3. Her body was found on the kitchen floor and his body was on the floor between the dining room and living room. They had been stabbed in their torsos and their throats had been cut. There were no signs of forced entry into the home. Exterior lights were burning, but interior lights were not. Efforts had been made to wipe footprints left in the blood at the scene. All fingerprints at the scene had been left by known friends or visitors, except four sets that never were identified. No murder weapon was ever found.

No valuables had been removed from the home. Silverware, cash, and jewelry in plain view had not been touched. The contents of a liquor cabinet were undisturbed. The Haysoms'

motor vehicles were parked outside and a set of car keys was found in the hallway.

Subsequently, the police investigation focused on Elizabeth, who voluntarily furnished blood and hair samples, fingerprints, and footprints. The police had learned about the pair's rental of the vehicle and that the miles the car was driven far exceeded the round trip distance from Charlottesville to Washington. In fact, the mileage was consistent with a trip from Charlottesville to Washington, Washington to Bedford and back, then from Washington to Charlottesville.

The police were unable to contact Soering until October 1985. Initially, he refused to provide blood or hair samples, fingerprints, or footprints, but later agreed to meet investigators to provide the requested forensic information. Before the appointed time, however, Soering fled to Europe, leaving school and forfeiting scholarships that provided full tuition and expenses. Shortly thereafter, Elizabeth fled and met Soering in Europe.

In 1986, the Bedford police learned the pair had been arrested and were incarcerated in London on various fraud charges. British police had searched the pair's apartment and found documentary evidence linking them to the murders.

During interrogation in jail in London, Soering confessed in detail on several occasions to having committed the murders.

He said he had traveled alone from Washington to Bedford, leaving Elizabeth in Washington to establish an alibi for him. Upon arriving at the Haysoms' home, he stated, he conversed with them over dinner at the dining room table, violence erupted, and he killed them both by stabbing and cutting their throats. He demonstrated to the police the manner in which their throats were cut.

Soering stated to the police that during the killings he cut two fingers of his left hand and that Mr. Haysom had struck him in the face. A witness testified that, at the victims' funeral, Soering had bandages on his fingers and a bruise on his face.

Soering's blood type proved to be Type "O," the same type as unidentified blood found at the murder scene. Neither the victims' blood nor Elizabeth's blood was Type "O." His fingerprints did not match any of the four sets of unidentified prints found at the scene.

Soering testified at the criminal trial. He denied any participation in the planning or commission of the murders. He testified that Elizabeth left the hotel in the rented vehicle, telling him she had to procure some drugs while in Washington because she was being blackmailed by another student, her Charlottesville drug supplier, who threatened to tell her parents of her continued drug use. According to Soering,

5

Elizabeth returned to the hotel room after midnight, stating, "I have killed my parents."

Elizabeth pled guilty as an accessory before the fact to both murders. She was sentenced to 90 years in prison.

We turn to the evidence presented at the habeas hearing. The convict showed that, prior to the criminal trial, his attorney filed a comprehensive discovery motion for "any and all evidence or information within the possession, custody, or control" of the prosecution "which is or might arguably be exculpatory," including information "which may tend to show that there are other individuals responsible for" the crimes.

The focus of the 1996 evidentiary hearing was the testimony, presented on behalf of the convict, of former Bedford County Deputy Sheriff George Anderson. Within a week of the Haysom murders, Anderson detained and questioned two men, William Shifflett and Robert Albright, who were walking or hitchhiking late at night on the Route 460 East bypass near Bedford. The officer became suspicious of the men because he rarely had seen persons walking there late at night. The men told Anderson they had been to Lynchburg "to see a girl" and were headed to Roanoke.

Anderson directed each of the men to place the contents of his pockets on the hood of the patrol car, and then questioned each of them while the other sat in the rear of the car. One of

6

the men carried a small beige tablecloth and a small, empty, nylon travel bag. Neither carried any large amount of money nor did there appear to be bloodstains on them or their belongings. There was no testimony that the tablecloth or bag were items missing from the Haysom home.

Anderson reported by radio the encounter to the Bedford Sheriff's Office and was told by a superior to release the men. Anderson discussed the incident the next day with another superior officer, who was involved in the Haysom investigation.

Ten days to two weeks after this incident, Anderson noticed the brass end of an object protruding from the rear seat of his patrol car. He found a Buck 110 folding knife. The knife had not been among the belongings the two men produced when Anderson stopped them on the bypass. Anderson did not recall that anyone else had been in the rear seat of his car after he stopped Shifflett and Albright, although he could not recall when, before the bypass incident, he previously had examined the seat.

Prior to the habeas hearing, the knife Anderson discovered was subjected, pursuant to the convict's request, to laboratory testing for traces of blood. There was no evidence that any blood was found on the knife.

The medical examiner who performed the Haysom autopsies testified that the blade of the knife was of such size and shape that it could have been the Haysom murder weapon, although he

7

said it was difficult to be certain of that fact because he could not determine precisely the dimensions of the blade of the murder weapon from the wounds on the bodies. The knife, a common type of folding knife, is readily available at retail stores.

On the night of April 5, Albright and Shifflett stayed under a bridge in Roanoke. The next day, in a drunken condition and after accosting and attempting to rob two persons, the duo met Marvin Millikin, a street person. They forced Millikin at knife point to a field, made him disrobe, beat and kicked him, and took his wallet. After leaving him in the field, they returned, stabbed him 26 times, and amputated his penis. Later, they were convicted of Millikin's murder.

Deputy Anderson learned of the arrests of Albright and Shifflett for the Millikin murder and began to suspect they might have been involved in the Haysom murders. He notified the Roanoke police of his suspicions.

No evidence was presented that Albright or Shifflett admitted any connection with the Haysom murders, nor was there any evidence that Elizabeth Haysom ever met or had any connection with either of the men. According to the record, the Roanoke police apparently did not make any connection between the Haysom and Millikin murders.

8

During Soering's prosecution, the Commonwealth never disclosed to the defense any circumstances of the Albright and Shifflett stop or the later discovery of the knife in Anderson's patrol car.

Upon review, the convict says there is no dispute the prosecution withheld evidence and no dispute "what the evidence was." He contends that the withheld evidence was exculpatory as a matter of law and that his convictions must be vacated.

The theory of Soering's defense was "that the crimes were committed by Elizabeth, with one or more accomplices." He argues, "It was established at the evidentiary hearing that the possibility of an accomplice to work with Elizabeth, and some suggestion as to who that might have been, was critically important to the defense of this case because of a jury's natural reluctance to find that a child, even an adult child, could commit this brutal crime on her own parents. This is even more true where, as here, the family involved was a 'nice' family, well known and respected, with money, educational benefits and social prominence."

He contends, "This evidence – concerning the presence of two men in the area of the crime, soon after the crime was committed, who were known criminals, indeed murderers, and who when stopped attempted to hide from authorities a knife which is consistent with being the murder weapon, and who [were] never

9

interrogated about the Haysom crimes nor had their hair or blood samples compared with crime scene samples – was clearly exculpatory."  We do not agree.

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Brady v. Maryland, 373 U.S. 83, 87 (1963).  Favorable evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  United States v. Bagley, 473 U.S. 667, 682 (1985).  Accord Kyles v. Whitley, 514 U.S. 419, 433, 434 (1995). In other words, a petitioner must show that when the case is evaluated in the context of the entire record, including the omitted evidence, a jury would have entertained a reasonable doubt regarding petitioner's guilt.  See Bagley, 473 U.S. at 682; United States v. Agurs, 427 U.S. 97, 112-13 (1976).  Accord Kyles, 514 U.S. at 460 (Scalia, J., dissenting).

Additionally, evidence that is inadmissible at trial is not "evidence" at all, for Brady purposes.  Wood v. Bartholomew, 516 U.S. 1, 5-6 (1995).  Thus, it is not "reasonably likely" that

10

disclosure of such information would result in a different outcome at trial. Id. at 8.

Urging denial of the habeas petition, the Attorney General contends that "the information concerning Albright and Shifflett would not have been admissible at Soering's trial." Evidence proffered by an accused that merely suggests a third party may have committed the crime charged is inadmissible; only when the proffered evidence tends clearly to point to some other person as the guilty party will such proof be admitted. Karnes v. Commonwealth, 125 Va. 758, 766, 99 S.E. 562, 565 (1919). Accord Oliva v. Commonwealth, 19 Va. App. 523, 527, 452 S.E.2d 877, 880 (1995). Although we have considerable doubt of the correctness of the convict's argument on this issue, we will agree with him for the purpose of this discussion and assume, without deciding, that the evidence would have been admissible at his trial.

We hold, however, that the convict has not established that material exculpatory evidence was withheld from his defense. Upon review of this entire record, we conclude there is no reasonable probability that, had the evidence in question been disclosed to the defense, the result of the criminal trial would have been different. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." Agurs, 427 U.S. at

11

109-10.  At most, the convict has established only such "mere possibility."

     For example, there is no connection whatever between Albright and Shifflett and the Haysom murders.  The convict only has proven that the men were present in the same county where the Haysoms were murdered near the time of the killings, and that the vagrants may have possessed a knife that may have been similar to the one used to kill the Haysoms.  As the habeas judge pointed out, "There are no confessions, no matching blood on the knife, no matching fingerprints, no stolen articles, no connection between these two men and Elizabeth Haysom . . . and no logical explanation as to why two drunken robbers and murderers would kill the Haysoms without taking valuables, vehicles and liquor."

     Also, except for the stabbing of the victims, the Millikin and Haysom murders were dissimilar, as the habeas judge stated. The respective murders differed in motivation as well as method. The Haysom killings, committed earlier in time, involved slashing of the victims' throats with severing of carotid arteries and jugular veins.  Millikin's throat was stabbed, not slashed, and he was sexually disfigured, a circumstance not present in the Haysom crimes.  Albright and Shifflett were motivated by a desire to rob their victims.  The Haysom murders

12

were not motivated by robbery; many valuable items in plain view were left intact in the Haysom home.

Additionally, in order to entertain a reasonable doubt based on the theory that the Haysoms were murdered by Albright or Shifflett, or both, acting with Elizabeth, the jury would have to disregard the overwhelming evidence presented at Soering's criminal trial that he alone committed the murders. For example, he confessed repeatedly in great detail, and the majority of those details fit the facts developed by the criminal investigation: the slashing of the victims' throats compatible with the manner he said he held the knife; the injuries he sustained during the violence at the time of the murders, which injuries were later observed at the funeral; the exterior lights left burning by the murderer controlled by a switch in a back bedroom, a location unknown to a stranger to the home like Soering, but known to a family member like Elizabeth; and documentary evidence (letters and diary entries) implicating him in the crimes, just to mention a few of the many circumstances consistent with his confessions. Moreover, Soering had a motive to kill his lover's parents, who opposed his relationship with their daughter. And, his flight to Europe after avoiding the police, resulting in the forfeiture of valuable scholarships, is also consistent with his admitted guilt.

In sum, the convict has failed to establish he is entitled to habeas relief.  Confidence in the outcome of his criminal trial has not been undermined.

Therefore, the judgment of the habeas court will be affirmed and the petition for a writ of habeas corpus will be denied.

<u>Affirmed and writ denied</u>.