## CIRCUIT COURT OF FAIRFAX COUNTY

Mario A. Bustillo

v.

Gene M. Johnson
and Ronald J. Angelone

September 16, 2003

Case No. (Law) 201879

BY JUDGE R. TERRENCE NEY

This matter came before the Court pursuant to the Petitioner's Motion to Reconsider the Court's Order of February 21, 2003, whereby the Court denied the Petition for Habeas Corpus Relief.

*Facts*

On December 10, 1997, John Merry was struck in the head with a baseball bat outside a Popeye's Restaurant in Springfield, Virginia. Merry died several days later as a result of his injuries.

On March 20, 1998, a jury found Petitioner Mario Bustillo guilty of first degree murder and sentenced him to thirty years in the penitentiary. On June 20, 1998, Bustillo made a Motion to Set Aside the Verdict. After an evidentiary hearing, the trial court denied Bustillo's motion and imposed the sentence recommended by the jury.

Trial counsel filed a timely Notice of Appeal from the sentencing order. The Petition for Appeal was denied by the Court of Appeals of Virginia on April 11, 2000. Bustillo next appealed to the Supreme Court of Virginia, which denied his appeal on January 17, 2001. The United States Supreme Court denied Bustillo's writ of certiorari on June 4, 2001.

Bustillo subsequently filed a Petition for a Writ of Habeas Corpus in the Fairfax Circuit Court claiming, among other things, that the Commonwealth had engaged in several acts of prosecutorial misconduct.[1] Specifically, Bustillo alleged that the Commonwealth:

1. Failed to disclose exculpatory evidence;
2. Engaged in improper and suggestive witness coaching;
3. Threatened and intimidated witnesses in exchange for incriminating testimony;
4. Failed to inform Petitioner of his Vienna Convention rights;
5. Had improper contact with a member of the jury; and
6. Prejudicially promoted Petitioner's alleged "gang" affiliation at trial.

On August 8, 2002, the Court[2] granted the Petition, in part, finding that a limited evidentiary hearing was required with respect to whether certain evidence, namely a videotape and photograph of an individual named "Sirena" who the defense claimed was responsible for the crime, was in the possession of the Commonwealth and, if so, whether such evidence was exculpatory in nature. The Petition with respect to all other issues raised was denied.

An evidentiary hearing on the issues of the videotape and photograph was set for December 5, 2002. Prior to the hearing, this Court granted various discovery requests[3] made by the Petitioner, including:

1. The production of the photograph of "Sirena" by the Commonwealth, if found;
2. The identity of any official of the Fairfax County Police Department, the investigative, or prosecution team who possessed it;
3. Any information possessed by the Fairfax Police Department pertaining to "Sirena," a.k.a. Julio Cesar Osorto Herrera; and
4. The investigative notes of Fairfax County Police Detective Richard J. Cline.

Pursuant to these discovery orders,[4] the Commonwealth produced to counsel for Bustillo a photograph of "Sirena," a copy of Detective Cline's notes of an interview with witness Jose Armando Amaya ("Amaya") dated

---

[1] Petitioner also raised the claim of ineffectiveness of counsel.

[2] The Honorable Henry E. Hudson presided over the August 8, 2002, evidentiary hearing.

[3] See this Court's Orders dated October 2, 2002, and November 15, 2002.

[4] *Id.*

January 7, 1998,[5] and a copy of Fairfax County Police Officer C. J. Mahoney's investigative report dated December 10, 1997, documenting his stop of an individual named Julio Osorto.[6] None of these items had been disclosed to the defense prior to the 1998 trial.

On December 5, 2002, the Court heard evidence regarding the videotape and photograph of "Sirena," and, in particular, when the Commonwealth obtained such evidence. Finding that neither the videotape nor the photograph were obtained by the Commonwealth during the investigation or prosecution, but rather were obtained post-trial,[7] and, as a result, the Commonwealth had no obligation under *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), to turn over the videotape or the photograph to the defense, the Court denied the Petition for a Writ of Habeas Corpus. After hearing evidence, the Court took the matter under advisement. The Court issued its Order denying the Petition for a Writ of Habeas Corpus on February 21, 2003.

In response, Bustillo filed a Motion to Reconsider based on the evidence furnished to the Petitioner by virtue of the discovery orders, in particular Detective Cline's notes from his interview with Amaya and Officer Mahoney's Report regarding the stop of Osorto.

On March 13, 2003, the Court issued a Suspending Order tolling the running of the twenty-one day period in order to conduct a further review of the matter.

---

[5] The notes of Detective Cline contain scattered references to "Sirena".as a person present at the scene. According to Detective Cline's notes dated January 7, 1998, Amaya told him that both Bustillo and "Sirena" were present at the Popeye's Restaurant on December 10, 1997, and that Amaya observed "Sirena" at the scene with a "bat cocked." The notes also reflect that Amaya stated that an individual identified as "Julio" was staying at the Chelsea Square Apartments, Apt. # 3 with an individual named Cruz Argueta, but that he left the area on December 31, 1997. In addition, Detective Cline's notes dated December 18, 1997, contain the following notation: "Sirena    Julio" as being one of the persons present at the scene.

[6] According to Officer Mahoney's Report, Officer Mahoney stopped and questioned an individual named Julio Osorto shortly after the crime while canvassing the area near the Popeye's Restaurant. Osorto appeared to have "ketchup stains" on his pants and shirt. Osorto indicated that he lived at the Chelsea Square Apartments, "but was confused on the address." Officer Mahoney issued Osorto a suspension/revocation form and released him.

[7] In a sworn affidavit dated April 29, 2002, Officer Abraham Gelabert testified that he "found the photograph [of Sirena] after trial." In addition, the evidence before the Court demonstrated that the videotape was initially procured by Petitioner's counsel and was subsequently furnished to the Commonwealth on March 5, 1999, almost one year *after* the trial.

*Analysis*

The issue before the Court is two-fold, namely whether Detective Cline's notes and/or Officer Mahoney's Report constitute exculpatory evidence and, if so, whether the disclosure of such evidence to the defense would have resulted in a different outcome at trial.

Suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution. *Soering v. Deeds*, 255 Va. 457, 464, 499 S.E.2d 514, 519 (1998), citing *Brady v. Maryland*, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). Favorable evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Id.*, citing *United States v. Bagley*, 473 U.S. 667, 87 L. Ed. 2d 481, 105 S. Ct. 3375 (1985).

Evidence that is inadmissible at trial is not true "evidence" for *Brady* purposes. *Id.*, 255 Va. at 464, 499 S.E.2d at 517 (1998), citing *Wood v. Bartholomew*, 516 U.S. 1, 5-6, 133 L. Ed. 2d 1, 116 S. Ct. 7 (1995). Evidence proffered by an accused that merely suggests a third party may have committed the crime charged is inadmissible; only when the proffered evidence tends clearly to point to some other person as the guilty party will such proof be admitted. *Karnes v. Commonwealth*, 125 Va. 758, 766, 99 S.E. 562, 565 (1919).

A petitioner has the burden of showing that, when the case is evaluated in the context of the entire record, including the omitted evidence, a jury would have entertained a reasonable doubt regarding the petitioner's guilt. *See United States v. Bagley*, 473 U.S. at 682; *see also United States v. Agurs*, 427 U.S. 97, 112-13, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976). The *Bagley* approach has been adopted by the Supreme Court of Virginia, *Correll v. Commonwealth*, 232 Va. 454, 352 S.E.2d 352 (1987), and the Court of Appeals of Virginia, *Carter v. Commonwealth*, 10 Va. App. 507, 393 S.E.2d 639 (1990). Thus, in order for Bustillo to be granted habeas corpus relief, this Court must find that (1) the Mahoney Report and/or Detective Cline's notes constitute exculpatory evidence and (2) the exculpatory evidence is material.

*Exculpatory Nature of the Mahoney Report
and Detective Cline's Notes*

Under *Brady*, exculpatory evidence is "evidence favorable to an accused," *Brady*, 373 U.S. at 87, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal. *Bagley*, 473 U.S. at 676.

Bustillo argues that prior to the 1998 trial, the Commonwealth's Attorney was well aware of the defense's theory that someone other than Bustillo, namely "Sirena," a.k.a. Julio, had committed the murder of John Merry. Indeed, that was the thrust of the defense case. Bustillo further alleges that not only was the Commonwealth fully aware that "Sirena" also went by the name of "Julio,"[8] but that the Commonwealth was also made aware that "Sirena" and Julio *Osorto* were one and the same person through Officer Mahoney's Report and Detective Cline's interview notes.[9] In addition, the Commonwealth was certainly aware that Merry's blood was found at the scene where he had been assaulted.

Hence, Bustillo argues that Detective Cline's notes, in particular the note equating Julio and Sirena,[10] the note indicating that Sirena held a "cocked" bat,[11] and the note documenting the Chelsea Square Apartment address,[12] and Officer Mahoney's Report, which stated that Julio Osorto bore "what appeared to be ketchup" on his clothes when he was questioned shortly after the crime near the place of its commission, must be deemed exculpatory. Notwithstanding the Commonwealth's alleged inability to equate "Sirena" with Julio Osorto prior to trial, the Petitioner asserts that the contents of the Mahoney Report and Detective Cline's notes, standing alone, are exculpatory, thereby requiring their disclosure prior to trial.

1. *Julio Osorto — Sirena*

Although not the prime focus of the December 5, 2002, evidentiary hearing, the testimony suggested that the police may not have known prior to trial that "Sirena," the individual referenced by Amaya during his interview with Detective Cline and later identified by others as the assailant,[13] and Julio

---

[8] In a letter to defense counsel dated March 9, 1998, the Assistant Commonwealth's Attorney Todd Sanders disclosed that "Sirena" was also known as "Julio," but did not further identify the latter.

[9] Officer Mahoney's Report on Julio Osorto reads, "[Osorto] stated that he lived at Chelsea Square Apts." Detective Cline's notes of his interview with Amaya on January 7, 1998, state that "Sirena" had been staying at "Chelsea Sq. Apt. 3." At the December 5, 2002, hearing, the Commonwealth argued that it made no connection between the two men and did not know that "Sirena," a.k.a. "Julio" was in fact Julio Osorto until months after the trial.

[10] See Detective Cline's notes of an interview with Nicholas Parada dated December 18, 1998.

[11] See Detective Cline's notes of his interview with Amaya dated January 7, 1998.

[12] See note 9, *supra.*

[13] At the post-trial hearing for a new trial held on July 13, 1998, several witnesses came forward and testified that "Sirena" was the assailant. See Testimony of Giovany Hernandez,

Osorto, the individual stopped by Officer Mahoney near the crime scene the night Merry was assaulted, were one and the same person. Nor would any reasonable police officer necessarily have made the connection with the facts available to them at the time.[14] Although Amaya referenced an individual named "Julio" during his interview with Detective Cline,[15] nowhere in Detective Cline's notes is "Julio" identified as "Julio Osorto."[16] As such, the Commonwealth testified that it had no reason to suspect or believe prior to trial that either the Mahoney report or those portions of Detective Cline's notes referencing "Julio," standing alone, were exculpatory in nature. The Commonwealth is charged with knowledge of what was contained in *both* reports. *Fitzgerald v. Bass*, 6 Va. App. 38, 50, 366 S.E.2d 615, 622 (1988) (constructive knowledge is attributed to the prosecutor where the information is in possession of the police) (citations omitted).

Turning to the specific evidence, the Commonwealth was certainly aware that Detective Cline conducted several pretrial interviews with various eyewitnesses, as the Commonwealth had Detective Cline testify at trial regarding his interviews with witnesses who had identified Bustillo as the assailant. The Commonwealth was also aware of Detective Cline's pretrial interview with Amaya, as the Assistant Commonwealth Attorney summarized the contents of that interview in a letter sent to defense counsel prior to trial.

Similarly, the Commonwealth knew, or is charged with knowing, of the existence of the Mahoney report prior to trial. Yet the Commonwealth offered no explanation as to why Detective Cline's notes or the Mahoney Report were not produced to defense counsel other than the argument that the information contained within Detective Cline's notes and the Mahoney Report was not exculpatory.

The Commonwealth should have known, given the contents of the investigative notes and the police report, that "Sirena-Julio" and Julio Osorto

---

Tr. 07/13/98, p. 20; Testimony of Marvin Escobar, Tr. 07/13/98, pp. 40-43; Testimony of Jose Maldonaldo, Tr. 07/13/98, pp. 56, 57.

[14] As the evidence presented at the December 5, 2002, hearing demonstrated, the police did not even have in their possession a photo of "Sirena" until months after the trial. After-discovered evidence does not constitute a basis for habeas relief. *Fitzgerald v. Bass*, 6 Va. App. 38, 366 S.E.2d 615 (1988).

[15] See *supra*.

[16] Petitioner's contention that reference to the Chelsea Square Apartments in both the Mahoney Report and Detective Cline's notes serve to put the Commonwealth on notice that "Sirena" and Julio Osorto were one and the same person, thus rendering the Mahoney Report and Detective Cline's notes exculpatory, is not dispositive. Two persons listing the same address as their place of residence does not necessarily dictate that such persons are one and the same. Certainly more than one person may occupy a particular residence at the same time.

might be one and the same person. Both the Mahoney Report and Detective Cline's notes unquestionably implicate "Sirena," a.k.a. Julio, and "Julio" Osorto, as a possible suspect. The Commonwealth should have made the connection, especially given the defense's insistence that "Sirena"/"Julio" was the assailant.

Moreover, although the Commonwealth disclosed to the defense prior to trial that Sirena was observed at the scene the night Merry was assaulted and that "Sirena's first name appears to be Julio,"[17] it failed to disclose that Amaya also told Detective Cline that he observed Sirena holding a bat in a "cocked" position. This latter piece of information not only makes clear that Sirena was present at the scene, but also implicates Sirena as the actual assailant.

As such, evidence that "Sirena-Julio" was observed approaching the victim and holding a bat in a "cocked" position and evidence that an individual named Julio Osorto was stopped by an officer on the night of the assault near the crime scene with red stains on his clothing must be deemed exculpatory.

## 2. *Stop of Julio Osorto*

With respect to the "ketchup stains" observed on Julio Osorto's clothing and referenced in the Mahoney Report, the evidence presented at trial was unclear as to a finding of blood *spatter* at the time Merry was struck. The Commonwealth's uncontradicted expert testimony at trial demonstrated that the fatal blow to the victim's head resulted in a closed head wound.[18] Yet the evidence also showed that there was blood at the scene,[19] including photographic evidence of what appeared to be blood spatter.

Given all of the evidence presented at trial concerning the nature of the victim's injury, which admittedly includes the absence of blood on the victim, the absence of blood on the bats, and the absence of blood on Bustillo, but yet with photographs of the crime scene depicting what appears to be blood

---

[17] In his letter to defense counsel dated March 9, 1998, Sanders informed the defense that "Jose Armando Amaya told [Detective Cline] that he saw the defendant and Sirena at the scene and both had bats."

[18] All the witnesses at trial agreed that the assailant struck a single blow with the bat and took off running. See Tr. 3/18/98, p. 131 (Michelle Gutierrez); Tr. 3/18/98, p. 222 (Jesse Konstanty); Tr. 3/18/98, p. 264 (Nicholas Parada); Tr. 3/18/98, p. 27 (Valeria Landaeta); Tr. 3/18/98, pp. 100, 111 (Amilcar Amaya); Tr. 3/18/98, p. 142 (Christina Hondoy). In addition, Dr. Frances Field, the medical examiner, noted that there was no breaking of the skin where the injury took place. See Tr. 3/17/98, p. 193.

[19] Dr. Frances Field further testified that bleeding from the ear after being struck would not be unusual with the victim's type of injury because the skull fracture could cause blood to seep into the inner ear then out of the ear canal. Tr. 3/17/98, p. 193.

spatter, and testimony identifying "Sirena-Julio" as the assailant, the Court finds that the information contained within Mahoney's Report, namely the stopping of a "Julio" near the crime scene at the time of the incident with red stains on his clothes, is exculpatory in nature warranting its production to the defense prior to trial.

### Materiality of the Mahoney Report and Detective Cline's Notes

Notwithstanding the exculpatory nature of Detective Cline's notes and the Mahoney Report, a new trial is not automatically required whenever a "a combing of the prosecutor's files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict." *Giglio v. United States*, 405 U.S. 150, 31 L. Ed. 2d 104, 92 S. Ct. 763 (1972). In other words, the Petitioner still must establish the materiality of such evidence.

As previously stated, implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial. *Bagley*, 473 U.S. at 676. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Soering*, 255 Va. 457, 465, 499 S.E.2d 514, 528, citing *United States v. Agurs*, 427 U.S. at 109-10. Rather, evidence is material only if there is a *reasonable probability* that, had the evidence been disclosed, the result of the trial would have been different. *Id.*, 255 Va. at 464, 499 S.E. at 519, citing *United States v. Bagley*, 473 U.S. 667, 87 L. Ed. 2d 481, 105 S. Ct. 3375 (1985).

A reasonable probability has been defined as a "probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682, quoting *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). In further defining the materiality standard, the *Strickland* Court explained that "when a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent errors, the factfinder would have had a reasonable doubt respecting guilt." 466 U.S. at 695. In determining whether Bustillo has established a "reasonable probability" that disclosure of Detective Cline's notes and/or the Mahoney Report to the jury would have effected the outcome of the trial, the Court considers the exculpatory evidence in context with the existing record.

First, although there is no manifest connection between the "Julio" stopped by Officer Mahoney and the assault of John Merry, Bustillo has shown that Julio Osorto was present in the general vicinity of where the crime occurred, near the time of the assault, with what appeared to be "ketchup

stains" on his shirt and pants. Additionally, both Officer Mahoney's notes and Detective Cline's notes reference the Chelsea Square Apartments with respect to "Julio's" reported residence.

Second, in order to entertain a reasonable doubt based on the theory that Merry was assaulted by Julio Osorto, a.k.a "Sirena," the jury would still have to disregard the substantial evidence presented at Bustillo's criminal trial that Bustillo was the assailant.

For example, several eye-witnesses testified at the 1998 criminal trial that Bustillo was the assailant. Michele Gutierrez testified that both "Sirena" and Bustillo were present at the crime scene[20] and that Bustillo was the one who took a bat and struck the victim.[21] Jesse Konstanty and Valeria Landaeta also testified that Bustillo was the assailant.[22]

In addition, Detective Cline testified about his pre-trial interview with Nicholas Parada ("Parada"),[23] who was present at the scene the night of the assault. Parada told Detective Cline that he observed "[Bustillo] standing there with a bat and the victim had fallen to the ground."[24] Detective Cline further testified that when he interviewed Parada on December 18, 1997, Parada told him that he actually saw Bustillo "swinging the bat ... he saw the bat swinging and he saw the person drop to the floor or to the ground. But [Parada] did indicate that he didn't actually see him strike the victim [although] he did see him swinging the bat in that direction." Testimony of Detective Cline, Tr. 03/18/98, p. 52. Detective Cline also stated that among all the people he interviewed at the crime scene the evening of the assault, "Mario" was the only one everybody identified as having swung the bat. Tr. 03/18/98, p. 53.

Petitioner points out that Nicholas Parada testified at trial that, although he did not see the assault, he did see Bustillo swing the bat in the direction of the victim. Tr. 03/17/98, p. 271. Petitioner contends that this observation recounts precisely the same act as that reported by Amaya in his interview with Detective Cline on January 7, 1998, which Amaya attributed to Sirena.

The jury, however, also heard testimony during the trial implicating "Sirena" as the assailant. Testifying for the defense, Amilcar Amaya[25] stated

[20] Testimony of Michele Gutierrez, Tr. 03/17/1998, p. 129.
[21] Id., Tr. 03/17/98, p. 131.
[22] Testimony of Jesse Konstanty, Tr. 3/17/98 p. 222; Testimony of Valeria Landaeta, Tr. 3/18/98, pp. 20-21. In addition, Valeria Landaeta testified on cross-examination that she told Detective Cline a week before the trial that she was certain the assailant was Bustillo "when she saw his face outside" the Popeye's Restaurant. Tr. 3/18/98, p. 36.
[23] See Detective Cline's notes of interview with Nicholas Parada dated December 18, 1998.
[24] Testimony of Detective Cline, Tr. 03/18/98, p. 51.
[25] Amilcar Amaya is not the same person as Jose Armando Amaya referred to in Detective Cline's notes dated January 7, 1998.

134

that he was outside the Popeye's when he saw "Senior Julio"[26] *also known as "Sirena"* take a bat and strike the victim.[27] Esmirna Hondoy also testified that she was at Popeye's and witnessed the assault. Although she could not identify the assailant, she testified that Bustillo was *not* the one who attacked the victim.[28]

The jury, having heard evidence in support of both theories, that the assailant was either Bustillo or Sirena/Senior Julio, believed the testimony offered by the Commonwealth's witnesses and found Bustillo guilty of first degree murder. On habeas review, the Court cannot consider or evaluate the weight or credibility of the evidence presented to the jury. *See Slayton v. Parrigan*, 215 Va. 27, 205 S.E.2d 680 (1974) (a prisoner is not entitled to use habeas corpus to circumvent the trial and appellate processes for an inquiry into an alleged non-jurisdictional defect of a judgment of conviction).

Notwithstanding, the Court, in addressing the materiality issue on habeas review, must consider what defense counsel could have done or might have done differently had Detective Cline's notes and/or the Mahoney Report been revealed to the defense prior to trial *and* what the effect would have been on the result of the trial had such evidence been presented to the jury. *Evans-Smith v. Taylor*, 30 Va. Cir. 116 (Loudoun County, 1993).

With respect to the first aspect, it is reasonable to assume that, had the defense known about Amaya's statement to Detective Cline regarding his observation of Sirena's holding a "cocked bat" and the police stop of Julio Osorto on the night of the assault, then the defense would have sought to have had Amaya, Officer Mahoney, and Julio Osorto testify on its behalf. Alternatively, in the event that such witnesses were unavailable to testify, defense counsel may have sought to have had Detective Cline's notes and/or the Mahoney Report introduced into evidence at trial to further support the defense theory that Julio/Sirena, not Bustillo, was the actual assailant. The Court does not opine on the admissibility of either Detective Cline's notes or the Mahoney Report and in particular whether such reports, if deemed hearsay, would fall under any of the exceptions to the hearsay rule.

---

[26] Amilcar Amaya indicated that he did not know "Julio's" last name.

[27] Testimony of Amilcar Amaya, Tr. 03/18/98, pp. 99, 100-01, 110-11.

[28] Testimony of Esmirna Hondoy, Tr. 03/18/98, pp. 142-43). Officer Bayliss, who was also called to testify for the defendant and was the first officer to arrive at the Popeye's the night of the crime, stated that when he spoke with Hondoy that night, she told him that the assailant was "Mario" and that Mario took the bat from another individual named Lisandro Parada. Testimony of Officer Bayliss, Tr. 03/18/98, p. 185. Detective Cline gave similar testimony in rebuttal. Testimony of Detective Cline, Tr. 03/18/98, p. 189.

Furthermore, with respect to the "ketchup stains" referenced in the Mahoney Report, the trial record is devoid of evidence that the victim suffered an open-head wound or testimony as to blood spatter, save the photographic evidence of what appeared to be blood at the scene. But Officer Mahoney's observations of "what appeared to ketchup on [Julio Osorto's] pant legs and a little on his shirt," when coupled with the photographs, tend to belie the evidence presented in support of the Commonwealth's closed head wound theory. With the Mahoney Report in hand, the defense might have further developed its theory of the case, namely, that the victim suffered an open head wound at the moment of impact and that the wound resulted in the transfer of the victim's blood to the assailant.

Third, the Court has to consider the effect that Detective Cline's notes, in particular Amaya's statement, and the Mahoney Report would have had on the result of the trial had such evidence been presented to the jury. While certainly arguable either way, additional corroborating witnesses for the defense might have bolstered its theory that Sirena was the actual assailant.[29] In addition, evidence of what may have been blood on Julio Osorto might have cast doubt not only on the Commonwealth's closed head wound theory, but also on Bustillo's guilt.

## Conclusion

Upon review of the entire record and a full consideration of the issues, the Court finds that the information contained within Officer Mahoney's Report and the information contained within Detective Cline's notes, documenting Julio Osorto/Sirena's presence and actions at the crime scene, are exculpatory and thus should have been disclosed to the defense prior to trial.

As to whether the notes of Detective Cline and Officer Mahoney show a reasonable probability that, had such evidence been disclosed to the defense, the result of the criminal trial might have been different, the Court is unwilling at this time to set aside the verdict and order a new trial absent further evidence as to such a probability. In order to properly determine whether disclosure of the police investigative notes and report to the jury would have affected the outcome of trial, the Court finds that a limited hearing on the issue

---

[29] As the Petitioner points out, Amaya's testimony certainly would not have been cumulative, as there was only one other defense witness (Amilcar Amaya) to inculpate Sirena as the assailant. In addition, the Commonwealth referred more than once in closing argument to the fact that the defense produced only one eyewitness to name the assailant in comparison to the several witnesses identifying Bustillo as the assailant. The Petitioner argues that Amilcar Amaya's testimony was ultimately rejected by the jury because of the lack of any corroborating witnesses.

of materiality is warranted in determining whether Bustillo has established that he is entitled to habeas relief.

The Motion to Reconsider is granted and the Petition for Habeas Corpus Relief remains on the Court's docket pending further proceedings.

## Order

This matter came before the Court pursuant to Petitioner's Motion for Reconsideration of this Court's February 21, 2003, Order, whereby the Court denied the Petition for a Writ of Habeas Corpus subsequent to a limited evidentiary hearing held on December 5, 2002. On March 13, 2003, the Court entered a Suspending Order tolling the running of the twenty-one day period to conduct a further review of the matter. For the reasons stated in this Court's opinion letter dated September 16, 2003, which is attached hereto and made a part hereof, the Petitioner's Motion to Reconsider is granted and the Petition for Habeas Corpus Relief remains on the Court's docket pending a limited evidentiary hearing on the issue of materiality.