## CIRCUIT COURT OF FAIRFAX COUNTY

Mario A. Bustillo

v.

Gene M. Johnson

May 4, 2004

Case No. (Law) 201879

BY JUDGE R. TERRENCE NEY

Pursuant to Mario Bustillo's Petition for Habeas Relief, this matter came before the Court on April 7, 2004, for a limited evidentiary hearing on the issue of materiality with respect to certain exculpatory evidence the Commonwealth of Virginia failed to disclose to the defense prior to the 1998 murder trial of Bustillo.

### *Facts*

On December 10, 1997, James Merry was struck in the head with a baseball bat outside a Popeye's Restaurant in Springfield, Virginia. Merry died several days later as a result of his injuries.

On March 20, 1998, a jury found Bustillo guilty of first degree murder and sentenced him to thirty years in the penitentiary. On June 20, 1998, Bustillo made a Motion to Set Aside the Verdict. After an evidentiary hearing, the trial court denied Bustillo's motion and imposed the sentence recommended by the jury.

After exhausting all of his appeals, Bustillo filed a Petition for a Writ of Habeas Corpus asserting, among other things, that the Commonwealth failed to disclose exculpatory evidence.

In his Petition for Habeas Relief, Bustillo also alleged that the Commonwealth engaged in improper and suggestive witness coaching; threatened and intimidated witnesses in exchange for incriminating testimony; failed to inform Petitioner of his Vienna Convention rights; had improper contact with a member of the jury; and prejudicially promoted Petitioner's alleged "gang" affiliation at trial. In addition, Bustillo claimed ineffectiveness of counsel.

On August 8, 2002, the Court[1] granted the Petition, in part, finding that a limited evidentiary hearing was required to determine whether the Commonwealth possessed at the time of trial a photograph and videotaped confession of "Sirena," an individual who the defense said was responsible for the crime, and, if so, whether such evidence was exculpatory in nature. The Petition with respect to all other issues raised was denied.

The evidentiary hearing was set for December 5, 2002. Prior to the hearing, this Court granted various discovery requests[2] made by Bustillo. Pursuant to the discovery orders, the Commonwealth produced a photograph of "Sirena," a copy of Detective Cline's notes of an interview with one Jose Armando Amaya dated January 7, 1998,[3] and a copy of Fairfax County Police Officer C. J. Mahoney's investigative report dated December 10, 1997, documenting his stop of an individual named Julio Osorto.[4] None of these items had been disclosed to the defense prior to the 1998 trial.

On December 5, 2002, after finding no evidence that the Commonwealth possessed either a photograph or videotaped confession of Sirena at the time of trial, the Court denied the Petition for a Writ of Habeas Corpus. The Court issued its Order denying the Petition for a Writ of Habeas Corpus on February 21, 2003.

---

[1] On August 8, 2002, the Honorable Henry E. Hudson issued a Memorandum Opinion and Order.

[2] See this Court's Orders dated October 2, 2002, and November 15, 2002.

[3] According to Detective Cline's notes dated January 7, 1998, Amaya told him that both Bustillo and "Sirena" were present at the Popeye's Restaurant on December 10, 1997, and that Amaya observed "Sirena" at the scene with a "bat cocked." The notes also reflect that Amaya stated that an individual identified as "Julio" was staying at the Chelsea Square Apartments, Apt. # 3, with an individual named Cruz Argueta, but that he left the area on December 31, 1997. In addition, Detective Cline's notes dated December 18, 1997, contain the following notation: "Sirena — Julio" as being one of the persons present at the scene.

[4] According to Officer Mahoney's Report, Officer Mahoney stopped and questioned an individual named Julio Osorto shortly after the crime while canvassing the area near the Popeye's Restaurant. Osorto appeared to have "ketchup stains" on his pants and shirt. Osorto indicated that he lived at the Chelsea Square Apartments, "but was confused on the address." Officer Mahoney issued Osorto a suspension/revocation form and released him.

In response, Bustillo filed a Motion to Reconsider based on evidence furnished by virtue of the Court's 2002 discovery orders, in particular Detective Cline's notes from his interview with Amaya and Officer Mahoney's Report regarding the stop of Osorto.

On September 16, 2003, the Court granted Bustillo's Motion to Reconsider, finding that the information contained in Detective Cline's notes, in particular the note equating Julio and Sirena,[5] the note indicating that Sirena held a "cocked" bat,[6] and the note documenting the Chelsea Square Apartment address,[7] and the information contained in Officer Mahoney's Report, which stated that Julio Osorto bore "what appeared to be ketchup" on his clothes when he was questioned shortly after the crime near the place of its commission, were exculpatory in nature and therefore should have been disclosed to the defense prior to trial.

With respect to the issue of materiality, the Court declined to set aside the verdict and order a new trial absent further evidence as to the probability that, had the evidence been disclosed to the defense, the result of the criminal trial might have been different.

A limited hearing on the issue of materiality was held on April 7, 2004.

### Analysis

Suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution. *Soering v. Deeds*, 255 Va. 457, 464, 499 S.E.2d 514, 519 (1998), citing *Brady v. Maryland*, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). Favorable evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Id.*, citing *United States v. Bagley*, 473 U.S. 667, 87 L. Ed. 2d 481, 105 S. Ct. 3375 (1985). In addition, evidence that is inadmissible at trial is not true "evidence" for *Brady* purposes. *Soering*, 255 Va. at 464, 499 S.E.2d at 517 (1998), citing *Wood v. Bartholomew*, 516 U.S. 1, 5-6, 133 L. Ed. 2d 1, 116 S. Ct. 7 (1995). Evidence proffered by an accused that merely suggests a third party may have committed the crime charged is inadmissible. *Karnes v. Commonwealth*, 125 Va. 758, 766, 99 S.E. 562, 565 (1919). Only when the proffered evidence tends to clearly point to some other person as the guilty party will such proof be admitted. *Id.*

---

[5] See Detective Cline's notes of interview with Nicholas Parada dated December 18, 1998.

[6] See Detective Cline's notes of his interview with Jose Armando Amaya dated January 7, 1998.

[7] *Id.* See also, *infra.*

A reasonable probability has been defined as a "probability sufficient to undermine confidence in the outcome."[9] Thus, "the mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Soering*, 255 Va. 457, 465, 499 S.E.2d 514, 518, citing *United States v. Agurs*, 427 U.S. at 109-10. Rather, a petitioner has the burden of showing that when the case is evaluated in the context of the entire record, including the omitted evidence, a jury would have entertained a reasonable doubt regarding the petitioner's guilt. *See United States v. Bagley*, 473 U.S. at 682; *see also United States v. Agurs*, 427 U.S. 97, 112-13, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976). The *Bagley* approach has been adopted by the Supreme Court of Virginia, *Correll v. Commonwealth*, 232 Va. 454, 352 S.E.2d 352 (1987), and the Court of Appeals of Virginia, *Carter v. Commonwealth*, 10 Va. App. 507, 393 S.E.2d 639 (1990).

In addition, the Court, in addressing the materiality of exculpatory evidence on habeas review, may consider what defense counsel could have done or might have done differently had the evidence been revealed to the defense prior to trial *and* what the effect would have been on the result of trial had such evidence been presented to the jury. *Evans-Smith v. Taylor*, 30 Va. Cir. 116 (Loudoun County 1993).

In support of the materiality of Detective Cline's notes and the Mahoney Report, Bustillo called four witnesses to testify about the presence of Sirena and/or blood spatter at the crime scene, matters which purportedly would have been further explored at trial and might have led to a different outcome had the Commonwealth disclosed the evidence to the defense.

### Dr. Peter Bernad

Dr. Peter Bernad, a licensed neurologist who reviewed Merry's autopsy report and treatment records in preparation for the April 7, 2004, hearing,[10] described Merry's injuries as severe blunt trauma to the left side of the head, multiple fractures, and destruction of bone and blood vessels. See testimony of Dr. Peter Bernad, April 7, 2004.

---

[9] *Bagley*, 473 U.S. at 682, quoting *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). In further defining the materiality standard, the *Strickland* Court explained that "when a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent errors, the factfinder would have had a reasonable doubt respecting guilt." 466 U.S. at 695.

[10] Dr. Frances Field, not Dr. Bernad, was the medical examiner who performed the autopsy of Merry in 1998.

Dr. Bernad further testified that the blow to Merry's head likely resulted in a ruptured eardrum, thus allowing blood to "seep" out of the left ear canal. *Id.* With respect to the time involved, Dr. Bernad explained that the blood would have had "significant velocity" to push through the tympanic membrane and exit the ear and that, given the injury sustained, bleeding would have occurred "almost immediately" after impact. *Id.*

On cross-examination, however, Dr. Bernad testified that he was not an expert on blood spatter. In addition, he conceded that while blood may have aerated from the ear immediately upon impact, it was also possible that given such an injury, it could have taken a couple of seconds for blood to "seep" from the ear. Moreover, Dr. Bernad testified that Merry's injury would not have produced a significant amount of bleeding. *Id.*

In reviewing Dr. Bernad's testimony in light of the existing record, including the crime scene photos, the prior testimony of the Commonwealth's expert regarding Merry's injuries,[11] and the prior testimony of several eye-witnesses,[12] his testimony fails to give rise to a reasonable doubt with respect to the nature of Merry's injuries and the closed head wound evidence shown by the Commonwealth. Notwithstanding Dr. Bernad's testimony that blood would have "sprayed/aerated" from the victim's ear at some point upon or almost immediately after impact, the crime scene photos revealed no signs of blood "spray," "spatter," or droplets, but rather only a few sizable drops of blood, the latter of which the Court finds consistent with blood seepage, not blood spatter.

## Yahayra Quierola

Yahayra Quierola, purportedly present at the Popeye's Restaurant the night Merry was attacked,[13] testified that upon hearing a "noise," she turned and saw blood on Merry's face and ears.[14] She further testified that her friend

---

[11] At the 1998 trial, Dr. Frances Field, the medical examiner, noted that there was no breaking of the skin where the injury took place. See Tr. 3/17/98, p. 193. Dr. Frances Field further testified, consistent with Dr. Bernad's testimony, that bleeding from the ear after being struck would not be unusual with the victim's type of injury because the skull fracture could cause blood to seep into the inner ear and then out of the ear canal. Tr. 3/17/98, p. 193.

[12] All the witnesses at trial agreed that the assailant struck a single blow with the bat and took off running. See Tr. 3/18/98, p. 131 (Michelle Guiterrez); Tr. 3/18/98, p. 222 (Jesse Konstanty); Tr. 3/18/98, p. 264 (Nicholas Parada); Tr. 3/18/98, p. 27 (Valeria Landaeta); Tr. 3/18/98, pp. 100, 111 (Amilcar Amaya); Tr. 3/18/98, p. 142 (Christina Hondoy).

[13] Quierola did not testify at the 1998 trial. At the post-trial hearing held on July 13, 1998, she identified a photo of Sirena and testified that he "looked like the assailant."

[14] See testimony of Yahayra Quierola, April 7, 2004.

"Christina," also present at the scene, had droplets of blood on her shirt after the attack.[15]

On cross-examination, Quierola testified that she saw blood coming from Merry's ears only, in contradiction to a prior statement she made under oath that she saw "blood explode from [Merry's] ears, nose, and throat." In addition, Quierola could not recall when or how quickly the blood began to "spurt" from Merry's ears.[16]

The Court does not find Quierola's testimony either persuasive much less dispositive on any issue of materiality with respect to either Detective Cline's notes or the Mahoney Report.

### Amilcar Amaya

Next, Amilcar Amaya testified that he saw Julio Osorto, a/k/a Sirena, strike Merry with a baseball bat,[17] and that upon impact, he observed blood spray "in the direction of" and "over" Sirena. See testimony of Amilcar Amaya, April 7, 2004.

The Court does not find Amaya's testimony credible. First, although Amaya testified that he saw blood spray toward Sirena upon impact, suggesting that it was on Sirena's shirt, Amaya later clearly testified that he did *not* observe any blood on Sirena's shirt. *Id.*

Second, Amaya's testimony is inconsistent with his prior testimony. Neither at the 1998 trial nor in his post-trial affidavit(s) did Amaya testify about the presence of blood at the moment of impact. See, *infra.*

Absent credible testimony regarding the presence of blood on Sirena's shirt, the materiality of Mahoney's Report is wanting. In addition, although Detective Cline's notes, which reference "Sirena," corroborate Amaya's testimony regarding Sirena's presence at the scene, they also place *Bustillo* at the scene, a fact plainly at odds with his alibi defense. As a result, the Court finds that Bustillo fails to demonstrate a reasonable probability that, but for the Commonwealth's nondisclosure of the notes, the result of the proceeding would have been different.

The Court also notes that, in order to entertain a reasonable doubt based on the theory that Merry was assaulted by Julio Osorto, a.k.a "Sirena," the jury would still have to disregard the substantial evidence presented at the 1998

---

[15] *Id.*

[16] *Id.* Interestingly, only this witness testified to observing blood coming from *both* of Merry's ears.

[17] See testimony of Amilcar Amaya, April 7, 2004. At the 1998 trial, Amaya testified that he was outside the Popeye's when he saw "Senior Julio" *also known as "Sirena"* take a bat and strike the victim. See testimony of Amilcar Amaya, Tr. 03/18/98, pp. 99, 100-101, 110-111.

trial that Bustillo was the assailant. For example, several eye-witnesses testified at the 1998 criminal trial that Bustillo was the assailant. Michele Gutierrez testified that both "Sirena" and Bustillo were present at the crime scene and that Bustillo was the one who took a bat and struck the victim. Testimony of Michele Gutierrez, Tr. 03/17/1998, pp. 129-31. Jesse Konstanty and Valeria Landaeta also testified that Bustillo was the assailant. Testimony of Jesse Konstanty, Tr. 3/17/98, p. 222; Testimony of Valeria Landaeta, Tr. 3/18/98, pp. 20-21. In addition, Valeria Landaeta testified on cross-examination that she told Detective Cline a week before the trial that she was certain the assailant was Bustillo "when she saw his face outside" the Popeye's Restaurant. Tr. 3/18/98, p. 36.

### David Bernhard

Lastly, David Bernhard, Bustillo's defense attorney at trial, was called to testify about possible defense strategies that might have been employed had the Commonwealth produced Detective Cline's notes and the Mahoney Report.

During the 1998 trial, the defense, relying primarily on an alibi defense, also argued that someone other than Bustillo, namely "Sirena," a.k.a. Julio, had struck and killed Merry.

In addressing the materiality of the undisclosed evidence, Bernhard testified that he was "shocked" to learn of the existence of Detective Cline's notes and the Mahoney Report because both tended to corroborate the existence and presence of Sirena at or near the crime scene shortly after the attack.[18] Bernhard further testified that, had he possessed the exculpatory documentation at the time of trial, he likely would have called Officer Mahoney to testify as to the presence of Sirena at or near the crime scene the night of the attack. *Id.* Bernhard further testified that, at trial, the Commonwealth made several references to the fact that the defense called only one witness in support of its position that Sirena, not Bustillo, was the assailant. Had the defense called Officer Mahoney to the stand to testify in support of its theory that Sirena was the actual assailant, Bernhard testified that this corroboration would have "enhanced" the defense's position.

In addition, Bernhard testified that, with Detective Cline's notes and the Mahoney Report in hand, both of which contained references to the "Chelsea Square Apartments" and an individual named "Julio," he might have "put something together" and determined that the "Julio" referenced in Detective

---

[18] See testimony of David Bernhard, April 7, 2004. Bernhard testified that, in preparing for trial, the defense had difficulty finding evidence to corroborate the existence of an individual named "Sirena" and/or his presence at the Popeye's Restaurant the night Merry was attacked.

Cline's notes and Julio Osorto referenced in the Mahoney Report were one and the same person, namely Sirena.

Officer Mahoney's Report on Julio Osorto reads, "[Osorto] stated that he lived at Chelsea Square Apts." Detective Cline's notes of his interview with Amaya on January 7, 1998, state that "Sirena" had been staying at "Chelsea Sq. Apt. 3." At the December 5, 2002, hearing, the Commonwealth argued that it made no connection between the two men and did not know that "Sirena," a.k.a "Julio," was in fact Julio Osorto until months after the trial.

Bernhard also testified that the Mahoney Report, which recorded the police stop of Julio Osorto with what appeared to be "ketchup stains" on his shirt, provided evidence of possible blood spatter in contradiction to the Commonwealth's expert testimony in support of a closed head wound. He said that he would certainly have "followed the matter up" further. Bernhard testified that, absent the Mahoney Report, he purposefully did not question witnesses at trial about Merry's injury or the presence of blood in order to reduce the risk of inflaming the jury. Even so, Bustillo's expert and lay testimony offered at the hearing failed to place blood on Sirena or otherwise contradict the Commonwealth's expert testimony. If anything, the evidence was corroborative. In either case, it did not undermine confidence in the jury verdict.

Most importantly, notwithstanding all the information that might have been plumbed from Detective Cline's notes and the Mahoney Report, Bernhard nonetheless testified that he was not certain that either document "would have borne any fruit" or have "changed the outcome" of the trial. In fact, Bernhard testified that, even absent Detective Cline's notes and the Mahoney Report, both of which documented "Sirena" and/or "Julio's" presence at or near the crime scene, he was fully aware of other potential witnesses who could corroborate the existence of Sirena and place Sirena at the scene of the crime, including Jose Armando Amaya. In his letter to defense counsel dated March 9, 1998, the Assistant Commonwealth's Attorney, Todd Sanders, informed the defense that "Jose Armando Amaya told [Detective Cline] that he saw the defendant and Sirena at the scene and both had bats." In the same letter, Sanders also disclosed that "Sirena" was also known as "Julio."

Notwithstanding, Bernhard made a "strategic decision" not to call those witnesses to testify. Bernhard testified that he was aware of several witnesses with "dubious credibility" who might have corroborated Sirena's existence and presence at the scene, but that the defense decided against calling such witnesses at trial, in particular Jose Armando Amaya, who had been detained by the authorities. Bernhard testified that he was "instructed by his client" not to talk to Jose Amaya and that the defense viewed him as an "evidentiary

threat," fearing that he would work with the prosecution in exchange for his freedom. Bernhard's commendable candor with the Court, especially when coupled with the respect he enjoys from the Court, was instrumental in addressing the fundamental issue presented.

## Conclusion

The jury, having heard evidence in support of both theories, that the assailant was either Bustillo or Sirena/Senior Julio, believed the testimony offered by the Commonwealth's witnesses and found Bustillo guilty of first degree murder. On habeas review, the Court cannot consider or evaluate the weight or credibility of the evidence presented to the jury. *See Slayton v. Parrigan*, 215 Va. 27, 205 S.E.2d 680 (1974) (a prisoner is not entitled to use habeas corpus to circumvent the trial and appellate processes for an inquiry into an alleged non-jurisdictional defect of a judgment of conviction).

Upon a complete review of the entire record and a full consideration of the evidence presented on the issue of materiality, the Court finds that Bustillo failed to demonstrate a reasonable probability that the disclosure and use of either Detective Cline's notes and/or the Mahoney Report would have resulted in a different outcome at trial. Even accepting fully evidence that the victim suffered an open head wound and bled at the moment of impact, there is no evidence of any transfer of the victim's blood to the assailant. As a result, the materiality of the undisclosed evidence is simply absent.

In addition, although Detective Cline's notes and the Mahoney Report, if produced prior to trial, might have provided additional avenues for the defense to explore and perhaps bolster its theory that Sirena was the actual assailant, Bernhard conceded that, notwithstanding the nondisclosure of the police notes and report, the defense was aware of other witnesses with knowledge about Sirena but made a strategic decision not to call them at trial. More importantly, as previously noted, Detective Cline's notes place Bustillo at the scene, a fact plainly at variance with Bustillo's alibi defense. Simply put, nothing was presented that suggests that the result of the original trial might have been different. Evaluating the case in context with the entire record, including the omitted evidence, the Court does not find that the jury would have entertained a reasonable doubt regarding Bustillo's guilt.

For these reasons, the Petition for Habeas Corpus Relief is denied.

## Final Order

This matter came before the Court on April 7, 2004, pursuant to Mario Bustillo's Petition for Habeas Relief for a limited evidentiary hearing on the

78

issue of materiality with respect to certain exculpatory evidence that the Commonwealth failed to disclose to the defense prior to the 1998 murder trial of Bustillo. For the reasons stated in this Court's opinion letter dated May 4, 2004, which is attached hereto and made a part hereof, the Petition for Habeas Corpus Relief is denied. This Order is final. The Court notes the Petitioner's exceptions to this Order.