UPON A REHEARING EN BANC
McCLANAHAN, Judge.
Lindsay Alan Bly was convicted in a bench trial of distributing an imitation controlled substance and distributing methamphetamine, both in violation of Code § 18.2-248. On appeal, Bly contends the trial court erred in denying his motion for a new trial on the grounds that the Commonwealth failed to disclose impeachment evidence concerning the confidential informant who testified against him, in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). A panel majority of this Court agreed with Bly and reversed the decision of the trial court. We granted a petition for rehearing en banc and stayed the mandate of the panel decision. Upon rehearing en banc, we affirm the trial court.
BACKGROUND
We review the evidence in the “light most favorable” to the Commonwealth as the prevailing party below. Commonwealth v. Hudson, 265 Va. 505, 514, 578 S.E.2d 781, 786 (2003) (citations omitted). That principle requires us to “discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom.” Kelly v. Commonwealth, 41 Va.App. 250, 254, 584 S.E.2d 444, 446 (2003) (en banc) (internal quotation marks and citations omitted).
Bly’s two drug distribution convictions arose from an investigation conducted by the Rockbridge Regional Drug Task Force (“Task Force”), comprised of Investigators Slagle, McFaddin, Mays, and Conner. At that time, the Task Force *4 was using Robert Hoyle, as a confidential informant, to make drug “buys” from individuals suspected of illegally selling controlled substances.

May 17, 2004 Offense

On May 17, 2004, as Investigator Slagle testified at trial, the members of the Task Force met with Hoyle in preparation for a purchase of cocaine from Bly. At the meeting, Slagle “thoroughly” searched Hoyle “to make sure he had no illegal contraband already on his person,” and no money. After none of those items were found on Hoyle, he was given fifty dollars in “marked money” with which to make the purchase. The Task Force members then drove Hoyle to an area near the back of the apartment building in the City of Buena Vista where Bly lived. From that location, Slagle observed Hoyle walk to the back porch of the building. Slagle then saw Bly, who was standing on the back porch and “actually greeted” Hoyle upon his arrival. Slagle also saw Bly’s wife standing on the back porch at the same time. Thereafter, Slagle watched Bly and Hoyle, , along with Bly’s wife, enter the back entrance of the apartment building together. Having been to Bly’s apartment during a previous investigation, Slagle explained that Bly’s apartment was the first one on the left from the back entrance of the building.
Slagle further testified that Hoyle was only in the apartment building “approximately three minutes.” Upon exiting the building, Hoyle walked back to the vehicle where the Task Force members were waiting, and entered the vehicle. Hoyle then “produced a small bag of white powder” that “look[ed] like powder cocaine,” and stated that he purchased it from Bly. Hoyle turned the contraband over to Investigator McFaddin. At that time, Slagle searched Hoyle for other contraband and money on his person and found none. Slagle later obtained a laboratory analysis of the “white powdery substance,” which revealed it was an imitation, i.e., it contained no controlled substance.
Hoyle likewise explained in his testimony that on May 17, 2004, while working as a confidential informant for the Task *5 Force, he purchased from Bly at Bly’s apartment what was purportedly cocaine. He also reiterated that, beforehand, the Task Force members thoroughly searched him for drugs and money, none of which he had, and then delivered him to a location near Bly’s apartment building. Hoyle further testified that he subsequently made the purchase of the contraband from Bly with money he received from the Task Force, that he was in and out of Bly’s apartment building within approximately two to three minutes, that he immediately turned over to the Task Force the bagged substance he received from Bly, and that he was again searched.

June 3, 200& Offense

Then on June 3, 2004, Investigators Mays and Conner met with Hoyle, as both of these investigators testified, for the purpose of arranging Hoyle’s second drug “buy” from Bly, which was to be a methamphetamine purchase. At this meeting, Mays conducted a search of Hoyle for “money [and] narcotics” and found none. Mays explained that the search was not “just a pat-down.” He “[went] into [Bly’s] pockets, his pockets [were] emptied; his shoes [were] taken off; his waistband, crotch area [were] checked; anywhere that [he] could feasibly hide something ... [was] checked.”
Mays and Conner then gave Hoyle one hundred dollars of “marked” money to make the purchase, and delivered him to an alley that led to Bly’s apartment building. They watched Hoyle walk down the alley to the apartment building as they drove to a location directly behind the building. They next observed Hoyle enter the back of the apartment building, and then exit the building seven to eight minutes later. Hoyle returned to Mays’ and Conner’s vehicle, and handed Conner a small “baggie” containing a “pink, rock-like substance,” which Hoyle said he purchased from Bly. Concluding the operation by conducting a final search of Hoyle, Conner “found no drugs on him.” Laboratory analysis revealed that the baggie, in fact, contained methamphetamine, a Schedule I or II controlled substance.
*6 Consistent with the testimony of Mays and Conner, Hoyle testified that on June 3, 2004, while still working as a confidential informant with the Task Force, he purchased “meth” from Bly at Bly’s apartment. He also confirmed that, as with the earlier “buy,” a member of the Task Force searched him beforehand, and gave him money to make the purchase. Hoyle further indicated he was not “surprise[d]” by the “actual Task Force numbers” that showed he was in Bly’s apartment building “approximately seven minutes.” Before entering Bly’s apartment for this second “buy,” Hoyle also explained, he walked upstairs and knocked on the apartment door of another resident with whom he was acquainted, but “[n]o one was there”—thus adding to the time he was in the apartment building.
Bly testified in his own defense, and denied even seeing Hoyle on either May 17, 2004 or June 3, 2004, after claiming to have specific recollection of those two days. In fact, Bly further stated that earlier in 2004 he told Hoyle to stay away from the apartment building where Bly lived (which he also purportedly managed for his parents) or “I will be serving papers on you” and that Hoyle “complied.”
When Bly was arrested on the drug distribution charges, he admitted to Investigator Slagle that he “buy[s] drugs” and “smoke[s] weed,” but denied that he “sells any.” He also admitted to Slagle that he occasionally “smokes dope, or weed, with his brother,” who worked at Dana Corporation, during his brother’s lunch hour. Bly was subsequently convicted, in a bench trial, on each of the drug charges, i.e., distributing an imitation controlled substance on May 17, 2004, and distributing methamphetamine on June 3, 2004, in violation of Code § 18.2-248.
Before being sentenced, Bly filed a motion to set aside the convictions and grant him a new trial. He contended in his motion that the Commonwealth, in violation of Brady, failed to disclose that Hoyle, while working for the Task Force as a paid informant in numerous cases, “was lying about at least some of the buys he was claiming to have made.” In support *7 of this allegation, Bly filed a copy of a letter, dated August 17, 2005, from the Commonwealth’s Attorney for Rockbridge County to an attorney in another pending criminal case. The Commonwealth’s Attorney represented in the letter that it was in response to defense counsel’s motion for discovery and addressed information requested about Hoyle, in connection to his work with the Task Force. The letter specifically provided, in relevant part, as follows:
Please treat this letter as my response to your Motion for Discovery and Inspection filed in the above captioned case —
Between January, 2004, and August, 2004, Robert Hoyle made a total of 83 controlled buys for the Drug Task Force in Rockbridge County and the City of Buena Vista____
With respect to paragraph F of your Motion, and some of which you already know, Hoyle alleged that he made purchases of controlled substances on June 15th and 16th, 2004 from [J.B.] in the South River Area of Rockbridge County. [J.B.] was charged by direct indictment, returned by the Grand Jury on November 1, 2004. [J.B.] was arrested on or about November 12, 2004, at which time it was discovered that he [J.B.] was in custody in the Rockbridge Regional Jail and could not have made the sale as alleged.
Investigator McFaddin advises that there was one other incident in which Hoyle purchased an illegal substance from someone he (Hoyle) identified as a certain individual in Buena Vista, Virginia. One of the Task Force Officers thought they may have seen that same individual in another location at the same time that Hoyle said he made the purchase. Hoyle was sent back to the location of the purchase to try to confirm his identification of the seller, but advised that no one came to the door. In this instance, no charges were ever placed against the suspect.
At the hearing on Bly’s motion, Bly presented no additional evidence and made no proffer in support of his motion. He relied only on the contents of the above-stated letter for its *8 purported impeachment value in challenging Hoyle’s credibility. He contended the letter evidenced that Hoyle lied about purchasing drugs from at least two individuals—J.B. and an unidentified person. In arguing that the “sole issue” in the case was Hoyle’s credibility, Bly’s counsel asserted, wrongly, that no one other than Hoyle “testified at trial ... that they saw Mr. Bly at [Bly’s] residence when ... Hoyle was sent in to buy drugs----”[1] His counsel also advanced the following “theory” of Bly’s innocence:
What we are alleging most likely happened is that Hoyle has secreted on his person somewhere, probably in his crotch, a little baggie of baking soda, or something along those lines, and he takes Task Force buy money, goes in, switches the baking soda for the buy money, puts the buy money in his crotch, walks back out and hands the Task Force baking soda, or does sell his own drugs.
In response, the Commonwealth’s Attorney indicated that, “even though [he] didn’t have actual knowledge” of the information in the letter regarding J.B., the information “should have been disclosed” to Bly. He further asserted, however, that it would have made no difference in the outcome of the case. He proffered that the Task Force officers and the informant would testify that it was a “case of mistaken identity.” As for the other reference in the letter to the unidentified individual that a Task Force officer “might have seen ... in a different location,” the Commonwealth’s Attorney stated that this assertion was “so vague” that it “really amount[ed] to nothing.” He also challenged Bly’s contention that the sole issue at trial was Hoyle’s credibility, in light of the Commonwealth’s other evidence and the trial court’s rejection of Bly’s alibi defense based solely on his own testimony. Finally, in regard to Bly’s theory of innocence, the Commonwealth’s Attorney responded that it was “just pure fiction,” given that there was no evidence to support it.
*9 Recognizing that Bly had no prior criminal history and expressing concern over the fact that Hoyle was an informant in at least some cases that had been dismissed, the trial court took Bly’s motion for a new trial under advisement and placed him on supervised probation. After Bly violated the terms of his probation, the trial court denied the pending motion and sentenced him to a term of imprisonment.
ANALYSIS
The principles on which a Brady violation is determined are well established. Under Brady, the prosecution’s suppression of evidence favorable to an accused “violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.” Brady, 373 U.S. at 87, 83 S.Ct. at 1197. A “true Brady violation” consists of three components: “[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued.” Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 1948-49, 144 L.Ed.2d 286 (1999). “Prejudice [is] defined as a ‘reasonable probability that the outcome of the proceeding would have been different had the evidence been disclosed to the defense.’ ” Deville v. Commonwealth, 47 Va.App. 754, 756-57, 627 S.E.2d 530, 532 (2006) (quoting Muhammad v. Commonwealth, 269 Va. 451, 510, 619 S.E.2d 16, 50 (2005)); see Strickler, 527 U.S. at 280, 119 S.Ct. at 1947; United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383-84, 87 L.Ed.2d 481 (1985).
Here, Bly relies on the nondisclosure of the information regarding Hoyle in the August 17, 2005 letter from the Rockbridge County Commonwealth’s Attorney for advancing his Brady claim. Bly argues the information could have been used to impeach Hoyle and he was prejudiced without it. The Commonwealth, while conceding that the prosecution did not provide the information to Bly and that it was arguably *10 favorable to him, contends Bly has failed to carry his burden of showing he was prejudiced by its nondisclosure.
“When an exculpatory evidence claim is reviewed ‘[o]n appeal, the burden is on appellant to show that the trial court erred.’ ” Gagelonia v. Commonwealth, 52 Va.App. 99, 112, 661 S.E.2d 502, 509 (2008) (quoting Galbraith v. Commonwealth, 18 Va.App. 734, 739, 446 S.E.2d 633, 637 (1994)). Based on our review of the record, along with the Commonwealth’s concession, it is evident Bly has established the second component of a Brady violation—the prosecution’s nondisclosure of the disputed information. Assuming, arguendo, Bly has also established the first component, i.e., that the information was favorable impeachment evidence,[2] we conclude he has failed to establish prejudice, the third component of Brady.
The trial court rejected Bly’s Brady claim when it denied his motion for a new trial, and then sentenced him on his two drug convictions from his bench trial. “ ‘Absent clear evidence to the contrary in the record, the judgment of a trial court comes to us on appeal with a presumption that the law was correctly applied to the facts.’” Caprino v. Commonwealth, 53 Va.App. 181, 184, 670 S.E.2d 36, 37-38 (2008) (quoting Yarborough v. Commonwealth, 217 Va. 971, 978, 234 S.E.2d 286, 291 (1977)); see Groves v. Commonwealth, 50 Va.App. 57, 61-62, 646 S.E.2d 28, 30 (2007) (“This means the ‘judge is presumed to know the law and apply it correctly in each case.’ ” (quoting Crest v. Commonwealth, 40 Va.App. 165, 172 n. 3, 578 S.E.2d 88, 91 n. 3 (2003))). Bly points to no such evidence in the record to rebut this presumption. Thus, for *11 purposes of this appeal, we presume the trial court correctly applied the principles dictated by Brady and made a factual determination that Bly was not prejudiced by the Commonwealth’s nondisclosure of the information regarding Hoyle set forth in the August 17, 2005 letter. See Deville, 47 Va.App. at 757-58, 627 S.E.2d at 582 (explaining that the trial court’s “no prejudice” determination under Brady, following appellant’s bench trial, was a factual finding).
Accordingly, here, as in Deville, where “a trial judge, sitting as ‘both trier of fact and arbiter of law,’ finds the Brady evidence inconsequential, there can be ‘no logical possibility1 that its earlier disclosure ‘would have altered the outcome of the case.’ ” Id. at 757, 627 S.E.2d at 532 (quoting Stroik v. State, 671 A.2d 1335, 1340 (Del.1996)). That is because, “[ujnder such circumstances, we need not hypothesize how a reasonable jury would likely have reacted to the new information. We know with certitude, from the factfinder himself, that the outcome of the proceeding would not have been different had the evidence been disclosed earlier.” Id. However, as further explained in Deville, “a trial court cannot foreclose appellate review by an ipse dixit denial of prejudice. Just as the original finding of guilt must fail if no ‘rational trier of fact’ could have made such a finding, so too the factual finding of no prejudice should be set aside if patently unreasonable.” Id. (internal citations omitted). From our review of the record in this case, we cannot say the trial judge’s presumptive finding that Bly was not prejudiced by the Commonwealth’s failure to disclose the information regarding Hoyle was patently unreasonable.
At Bly’s trial, the court heard not only the testimony of Hoyle regarding his “drug buys” from Bly at Bly’s apartment on May 17, 2004 and June 3, 2004 while working as a confidential informant for the Task Force, the court also heard the testimony of three Task Force members, Investigators Slagle, Mays, and Conner, who were directly involved with those “buys.” According to the investigators’ testimony, Hoyle was thoroughly searched for drugs and money both before and *12 after each of the transactions between Hoyle and Bly, which included a search of Hoyle’s crotch. During the intervening period, Hoyle was only out of the Task Force members’ sight for the brief period he was in Bly’s apartment building making a “drug buy,” which was no more than three minutes during the first transaction and eight minutes during the second transaction. Investigator Slagle also testified that, at the time of the first transaction, he actually saw Bly “greet” Hoyle on the back porch of Bly’s apartment building before Bly, along with Bly’s wife, escorted Hoyle into the building.
The trial court also heard Bly testify in his own defense, during which he unequivocally denied even seeing Hoyle at Bly’s apartment building on either May 17, 2004 or June 3, 2004, and claimed to have been somewhere else when the meetings with Hoyle were to have occurred. Bly further testified that earlier in 2004 he had directed Hoyle to stay away from the apartment building where Bly lived (which he purportedly managed) and that Hoyle “complied.” At least as to the events of May 17, 2004, Bly’s testimony was directly contrary not only to Hoyle’s testimony, but to that of Investigator Slagle, as well. As fact finder, the trial court was entitled to disbelieve Bly’s self-serving testimony and conclude that he was “lying to conceal his guilt.” Commonwealth v. Duncan, 267 Va. 377, 385, 593 S.E.2d 210, 215 (2004); Shackleford v. Commonwealth, 262 Va. 196, 209, 547 S.E.2d 899, 907 (2001); Marable v. Commonwealth, 27 Va.App. 505, 509-10, 500 S.E.2d 233, 235 (1998).
Furthermore, there was no evidence presented in this case to support Bly’s theory that Hoyle had either drugs or baking soda of his own hidden in his crotch the two times he allegedly met with Bly to buy drugs and that he then produced the hidden substance to the Task Force when he returned from each of the alleged transactions—with Hoyle having made no actual purchase of drugs or an imitation substance from Bly on either occasion. “ ‘The Commonwealth need only exclude reasonable hypotheses of innocence that flow from the evidence, not those that spring from the imagination of the defendant.’” Ward v. Commonwealth, 47 Va.App. 733, 751, *13 627 S.E.2d 520, 529 (2006) (quoting Hamilton v. Commonwealth, 16 Va.App. 751, 755, 433 S.E.2d 27, 29 (1993)).
Finally, we do not view the trial judge’s comments during the hearing on the motion for a new trial, acknowledging Bly’s lack of a criminal history and the dismissal of cases where Hoyle was an informant, as undermining the validity of the trial judge’s denial of the motion. To do so, in view of the totality of the record here presented, would be to “fix upon isolated statements of the trial judge taken out of the full context in which they were made, and use them as a predicate for holding the law has been misapplied,” which we will not do. Yarborough, 217 Va. at 978, 234 S.E.2d at 291.
CONCLUSION
Upon our review of both the evidence presented at trial and the undisclosed information in dispute, we conclude the trial court reasonably rejected Bly’s Brady claim. The trial court, therefore, did not err in denying Bly’s motion for a new trial. Accordingly, we affirm Bly’s convictions.

Affirmed.

. As explained, supra, Investigator Slagle testified that he saw Bly meet Hoyle at the entrance to Bly's apartment building at the time of Hoyle’s first "drug buy” from Bly.

. We do not decide whether the information in the letter was admissible impeachment evidence, see Gamache v. Allen, 268 Va. 222, 229, 601 S.E.2d 598, 602 (2004) (addressing what constitutes impeachment evidence), and, if not, whether Bly established that it would lead to admissible impeachment or exculpatory evidence, see Workman v. Commonwealth, 272 Va. 633, 648, 636 S.E.2d 368, 377 (2006) (addressing the requirement to at least "proffer! ] admissible evidence that would have been discovered” had defendant known of the undisclosed information in a timely manner). See also Wood v. Bartholomew, 516 U.S. 1, 5-6, 116 S.Ct. 7, 9-10, 133 L.Ed.2d 1 (1995); Soering v. Deeds, 255 Va. 457, 465, 499 S.E.2d 514, 518 (1998).