Richard STROIK and Ronald Biddle,
Defendants Below, Appellants,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Nos. 137, 138, 1994.

Supreme Court of Delaware.

Submitted: Oct. 11, 1995.
Decided: Jan. 12, 1996.
Rehearing Denied Feb. 26, 1996.

Raymond M. Radulski (argued), Timothy J. Weiler (argued), and Bernard J. O'Don-nell, Assistant Public Defenders, Wilmington, for Appellants.

William E. Molchen (argued), and Thomas A. Stevens, Deputy Attorneys General, Wilmington, for Appellee.

Before VEASEY, C.J., WALSH and HOLLAND, JJ.

VEASEY, Chief Justice:

In this appeal we review several assignments of error asserted to reverse sentences imposed on convictions for various offenses. Defendants below-appellants, Ronald Biddle and Richard Stroik ("Stroik and Biddle" or "defendants"), appeal sentences of the Superior Court based on convictions for racketeering, conspiracy to commit racketeering, felony theft and misdemeanor theft on various grounds enumerated below. We find that the contentions of Stroik and Biddle are

without merit and hold that: (1) the search warrant issued in this case by Justice of the Peace Court 18 did not exceed that court's jurisdiction to issue search warrants; (2) the Superior Court's factual findings were supported by ample record evidence; (3) the Superior Court did not err in holding that the State's failure to release the criminal records of its witnesses was harmless error; (4) the evidence adduced at trial was sufficient to demonstrate the elements of the crime of racketeering as defined by the Delaware Racketeer–Influenced and Corrupt Organizations ("RICO") statute; (5) the State adduced sufficient evidence to support defendants' convictions for conspiracy to commit racketeering; and (6) the offenses of racketeering and conspiracy to commit racketeering do not merge under 11 *Del.C.* § 521(c). Accordingly, we **AFFIRM.**

## I. FACTS

Stroik and Biddle were arrested in June of 1992 and indicted along with ten other individuals. The State's case against Stroik and Biddle derived from their association with a business entity known as First State Leasing, Inc. ("FSL"). FSL purportedly engaged in the leasing and sale of cars to clients with poor credit histories. The indictment charged Stroik and Biddle with 81 separate counts including racketeering, conspiracy to commit racketeering, six counts of defrauding a secured creditor, six counts of insurance fraud, forgery in the second degree, eighteen counts of misdemeanor theft and forty-eight counts of felony theft.

FSL engaged in what it referred to as the automobile subleasing business. Under this business plan, FSL purported to assist parties seeking to acquire a new or used car. For a fee, FSL would place these individuals in contact with a party seeking to terminate a lease on a vehicle. The goal was for the party in possession of a vehicle (Party A) to be placed with a party seeking to acquire a vehicle (Party B). Once the connection was made, Party B would purportedly purchase Party A's vehicle.

FSL promised to provide to its clients "professional negotiating services" which would presumably culminate in the customer's taking title to the vehicle of his or her choice. FSL, however, through a variety of deceptive practices, ultimately placed customers in cars leased by other individuals. Essentially, the transaction between FSL and its clients constituted an installment sale of a vehicle owned by a third party (*i.e.,* title would not vest in Party B until all payments were made to Party A and Party A's lease expired). The result was a clear contravention of Party A's contractual arrangement with the vehicle lessor. FSL clients never took good title and, in a number of cases, the cars were repossessed by the lessor. Thus, although FSL promised its clients ownership of a vehicle, all they delivered was a heavily encumbered vehicle, the sale of which violated contractual obligations of the original lessee (Party A).

In addition to failing to meet its promises as to vehicle title, FSL would consistently deliver substandard or otherwise defective automobiles to its clients. Stroik and Biddle preyed on their clients' lack of resources and alternatives, demanding greater and greater sums of money to secure receipt of a car. Once a car was delivered, Stroik and Biddle would conceal from the client the defects in the client's title. In fact, in most cases the client never took title to the car since the original lessee (Party A) did not have title to convey.

Based on these facts, the case proceeded to a bench trial in which the Superior Court judge found Stroik and Biddle guilty of racketeering, conspiracy to commit racketeering, and 41 counts of felony theft. Additionally, Stroik was found guilty of 17 counts of misdemeanor theft and Biddle was found guilty of 16 counts of misdemeanor theft. All other charges were dismissed. From this decision Stroik and Biddle appeal.

## II. VALIDITY OF THE SEARCH WARRANT

### A. Jurisdiction of the Justice of the Peace Court

Defendants contend that the search warrant served and executed upon FSL (the "FSL warrant") was invalid because it exceeded the jurisdiction of a Justice of the

Peace Court. Defendants contend that all fruits of the original FSL warrant should be excluded. The subsequent warrant issued for the home of Stroik is also claimed to be invalid since the fruits of the FSL warrant provided probable cause for the issuance of the Stroik residence warrant. We find these arguments to be without merit.

■ This Court has not addressed the limitations imposed on the warrant power of a Justice of the Peace Court. Although there are extensive limitations imposed upon the jurisdiction of Justice of the Peace Courts generally, the statutory language empowering Justice of the Peace Courts to issue search warrants does not support defendants' contention that the warrant power is similarly limited. 11 *Del.C.* § 2304 provides, in pertinent part, that:

> Any Judge of the Superior Court, the Court of Common Pleas, the Municipal Court for the City of Wilmington, or *any justice of the peace,* or any magistrate authorized to issue warrants in criminal cases *may, within the limits of their respective territorial jurisdictions, issue a warrant* to search any person, house, building, conveyance, place or other thing for each or any of the items specified in § 2305 of this title. (Emphasis supplied).

11 *Del.C.* § 2701 delineates the matters over which the various courts of the State have jurisdiction. As to Justice of the Peace Courts, section 2701(a) provides that the jurisdiction of a Justice of the Peace is statewide unless expressly provided by law. Defendants point to no express statutory restriction on the power of Justices of the Peace to issue search warrants in any particular part of the State. We hold that the warrant issued for the search of FSL's premises is valid and all fruits of that warrant are admissible.

A close reading of the relevant statutory language reveals the flaw in defendants' argument: Read in conjunction with section 2304, section 2701 provides that, although the particular Justice of the Peace may not have *subject matter* jurisdiction over the crime alleged to have been committed, the Justice of the Peace does have *territorial* jurisdiction to issue search warrants anywhere in the State of Delaware. The flaw in defendants' argument, therefore, stems from the plurality of meanings attached to the word "jurisdiction." 11 *Del.C.* § 2304 speaks in terms of *territorial* jurisdiction, while defendants' argument rests on limitations on the *subject matter* jurisdiction of the Justice of the Peace Courts.

Defendants essentially argue that the Justice of the Peace Courts may not issue a warrant in a case which they are not empowered to decide on the merits. From the interlocking web of jurisdictional mandates found in section 2701, defendants divine an express statutory restriction on the warrant power of Justices of the Peace. This construction of the statute, however, places a burden on law enforcement officers which is not consistent with the statutory scheme. If read as Stroik and Biddle suggest, the statute would require the police to determine *ex ante* precisely what charges will be brought against a particular accused. Thus, if a party were thought to have engaged in misdemeanor theft, a crime within the subject matter jurisdiction of the Justice of the Peace, but upon execution of the search warrant was discovered to have engaged in felony theft, a crime outside the scope of the subject matter jurisdiction of the Justice of the Peace, then the fruits of the search warrant would have to be excluded in the prosecution for felony theft. This result would be plainly absurd.

The purpose of a search warrant is to provide a constitutional procedure that enables the State to build the evidentiary background of its case. Further, the only requirement for the issuance of a search warrant is probable cause, not proof of guilt. Therefore, requiring the State to determine *ex ante* what charges will ultimately be brought defeats the intent of the statutory scheme. As intended by the General Assembly, a Justice of the Peace should be available to determine whether probable cause exists to support issuance of a warrant. Once the warrant is executed and the State builds its case, the State will then pursue its claims against the accused in a court of appropriate subject matter jurisdiction. Reading the additional layer of complexity into the statute suggested by Stroik

and Biddle only serves to frustrate the intent of the legislature and the clear import of the statute.

## B. No Deficiency in the Search Warrant

Defendants also claim that the search warrant was constitutionally deficient because it failed to allege the commission of a crime. This argument contends that the absence of criminal allegations in the first warrant robs that warrant of probable cause and therefore requires quashal. The State correctly points out that this is a legally untenable position.

■ This Court has never held that a showing sufficient to support a criminal conviction is necessary to justify procurement of a search warrant. *Jensen v. State,* Del. Supr., 482 A.2d 105 (1984). In fact, the showing required to obtain a search warrant is far less rigorous than that necessary to obtain a criminal conviction. In its affidavit, the State alleged numerous facts which, if taken as true, support convictions for a variety of offenses, including fraud and theft by false pretenses. Stroik and Biddle would now have the Court require a showing of guilt beyond a reasonable doubt in order for law enforcement personnel to procure a search warrant. This result would stand the process of criminal justice on its head. Accordingly, defendants' arguments are without merit.

## III. THE SUPERIOR COURT'S FACTUAL FINDINGS WERE SUPPORTED BY THE RECORD

In their second assignment of error, Stroik and Biddle attack certain factual findings of the Superior Court. At the close of evidence, Stroik and Biddle requested that the trial judge make specific findings of fact upon which the determination of guilt was based. The trial judge accommodated this request and Stroik and Biddle now seek to refute these findings as either erroneous or unsubstantiated by the evidence. Stroik and Biddle contest some 23 separate findings of fact. After reviewing these claims and the record on appeal, we hold that all the contested factual findings are supported by ample record evidence.

## IV. THE STATE DID NOT WITHHOLD EXCULPATORY EVIDENCE IN CONTRAVENTION OF *BRADY V. MARYLAND,* 373 U.S. 83 (1963)

In their third assignment of error, defendants contend that the State unreasonably withheld potentially exculpatory evidence from the defense in contravention of the United States Supreme Court's holding in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *see also Michael v. State,* Del.Supr., 529 A.2d 752 (1987). Specifically, Stroik and Biddle claim that the State failed to release criminal records of prosecution witnesses which may have negatively impacted on the credibility of those witnesses. Defendants also note the repeated requests made to the prosecution to reveal this information.

■ In *Brady v. Maryland, supra,* the United States Supreme Court held that a defendant's Fourteenth Amendment due process rights are violated where the prosecution fails to release certain potentially exculpatory evidence. Noting that the prosecution is under no obligation to reveal to the defense all evidence in its possession, the *Brady* Court established a three-part test to determine whether particular evidence should have been released. Thus, under *Brady,* evidence must be released if: 1) the information is requested by the accused and withheld by the prosecution, 2) the information is favorable to the accused's case, and 3) the evidence is material to either the determination of guilt or the determination of the appropriate sentence. *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196. Subsequent cases have held that *Brady* applies to impeachment evidence as well as exculpatory evidence. *See United States v. Bagley,* 473 U.S. 667, 675, 105 S.Ct. 3375, 3379, 87 L.Ed.2d 481 (1985).

■ Turning to the case at bar, it is clear that defendants have not met the requirements of *Brady.* First, it is questionable whether the State withheld information from the defense. Stroik and Biddle did make requests to the State to release the criminal histories of prosecution witnesses. The State, however, released what information it had available. Only five of the State's wit-

nesses had any criminal records to reveal. Of these five, the records of three witnesses, Stiltz, Slemko, and Bowers, were revealed to the defense. The two remaining witnesses with criminal records were Brooks and Berry. It appears that the State itself did not have criminal histories on these two individuals.

Second, assuming *arguendo* that the State withheld evidence, the evidence was not necessarily favorable to the defense. The second prong of the *Brady* analysis requires disclosure of evidence only if it is favorable to the defendant's position. Here, the evidence alleged to have been withheld showed only that two of the witnesses were previously convicted of writing bad checks. These witnesses, Brooks and Berry, were victims of the alleged fraud perpetrated by FSL. While the evidence in question may have tended to diminish the credibility of Brooks and Berry, it is unclear that this evidence would be favorable to the defense within the scope of the holding in *Brady*. Brooks and Berry testified primarily as to the nature and specifics of transactions they engaged in with FSL. These transactions were fully documented. Impeachment evidence in this context can hardly be considered exculpatory and is, more accurately, only marginally favorable at best. If there was any error, it was harmless.

■ Finally, under *Brady*, the defense is required to show that the evidence withheld was material. The Supreme Court has indicated that "implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Thus, *Brady* is violated only where there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is [defined as] a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383.

In light of the fact that trial in the Superior Court was held before the trial judge sitting without a jury, it is clear that this evidence was not material in the sense denot-ed by *Agurs* and *Bagley*. The trial judge heard defendants' *Brady* objection and considered the weight he would attach to the criminal records of Brooks and Berry. The judge found this evidence to be inconsequential. Since the trial judge sat as both trier of fact and arbiter of law, there is no logical possibility that disclosure of the criminal histories of Berry and Brooks would have altered the outcome of the case. Therefore, the evidence was not material as contemplated by *Brady* and its progeny. The State's failure to produce criminal histories of its witnesses is not reversible error.

## V. RACKETEERING PROVED BEYOND A REASONABLE DOUBT

In their fourth assignment of error, Stroik and Biddle contend that the State produced insufficient evidence at trial to prove beyond a reasonable doubt the elements of the crime of racketeering as defined by the RICO Act. 11 *Del.C.* § 1501, *et seq.* Defendants were convicted, *inter alia*, of criminal racketeering and conspiracy to commit racketeering as proscribed by 11 *Del.C.* § 1503(a) and (d). Specifically, defendants contend that the State did not introduce adequate evidence to support the trial court's finding that a racketeering "enterprise" existed "separate and apart" from the criminal acts of the defendants, and that a "pattern of racketeering" had been shown. Existence of an "enterprise" and presence of a "pattern of racketeering" are both elements of the crime charged and must therefore be proved by the State beyond a reasonable doubt. 11 *Del.C.* § 1503(a).

11 *Del.C.* §§ 1502(3) and (5) define the terms "enterprise" and "pattern of racketeering activity" in rather general terms, and Delaware courts have not had occasion to refine these definitions. The most persuasive definitions of these terms are therefore provided by the various federal courts. Since the Delaware RICO statute is essentially an adaptation of its federal counterpart, reliance on federal precedent in this limited factual setting is warranted.

### A. Existence of an "Association-in-Fact" Enterprise

Choosing among the two broad categories of enterprise enumerated in the statute, the

State apparently sought to demonstrate the existence of an "association or group of persons associated in fact, although not a legal entity." 11 *Del.C.* § 1502(3). The trial judge used the standard announced by the United States Supreme Court in *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), as refined by the Third Circuit in *United States v. Riccobene*, 3d Cir., 709 F.2d 214 (1983), to determine whether the requisite showing of association-in-fact enterprise had been made. Limited strictly to the facts of this case, the Court approves of the trial judge's use of the *Turkette–Riccobene* standard.

■ As dictated by *Turkette* and *Riccobene,* an enterprise is demonstrated where the State proves:

(1) that the enterprise is an ongoing organization with some sort of framework for making or carrying out decisions;

(2) that the various associates function as a continuing unit; and

(3) that the enterprise be separate and apart from the pattern of activity in which it engages.

*United States v. Pelullo,* 964 F.2d 193, 211 (1992) (citing *Riccobene,* 709 F.2d at 221–24). Defendants contend that the State made an inadequate showing to support the trial judge's finding that the enterprise existed separate and apart from the criminal acts of the defendants. We find this contention to be without merit.

■ The record clearly supports the trial judge's finding that FSL was an enterprise within the contemplation of the statute. As required by *Turkette* and *Riccobene,* FSL displayed an organizational continuity and possessed a fully evolved decisionmaking framework. FSL operated as a full-fledged business with offices, staff, equipment, supplies and a growing customer base. Using three branch offices, customers were ensnared through various forms of advertising and channeled to "associates" who purportedly could assist them in procuring the car of their choice. Despite the felonious purposes underlying FSL, on surface the company functioned much as a legitimate enterprise might. At the helm of this superficially reputable business were Stroik and Biddle, who provided the requisite decisionmaking structure.

Consistent with the second requirement of *Turkette* and *Riccobene,* the various components of the FSL scheme operated as a continuing unit. FSL, during its operating lifetime, expanded its business and planned for the future. The participants in the scheme occupied identifiable positions and performed routinized tasks. Clearly the requisite continuity of association is present here.

Turning to the last of the *Turkette–Riccobene* factors, it is also clear that the enterprise, FSL, existed separate and apart from the pattern of racketeering at issue in this case. Stroik and Biddle contest this point, however. The defendants argue that, since FSL was primarily a vehicle through which Stroik, Biddle and the other indicted defendants could defraud the public, the enterprise did not exist independently of its criminal origins. The State rebuts this contention by pointing to the "common-sense" approach adopted by the Eighth Circuit in *United States v. Lemm,* 8th Cir., 680 F.2d 1193 (1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983). The *Lemm* court held that an enterprise exists separate and apart from the criminal acts of its principals if the "association could have conducted its activities" without committing the predicate felonious acts. *Lemm,* while not a perfect approach, provides manageable criteria for the trial court to use in determining whether an enterprise exists "separate and apart" from the pattern of racketeering. Reliance on the *Lemm* approach is therefore appropriate in this limited factual context.

From an objective analysis of the facts, it appears that an independent enterprise did exist as envisaged under 11 *Del.C.* § 1503. FSL clearly could have been a legitimate business, but for the criminal designs of Stroik and Biddle. FSL, therefore, existed separate and apart from the criminal acts of Stroik and Biddle. The trial judge's rulings on this subject are supported by ample record evidence and his conclusions are the product of an orderly and logical deductive

process. Therefore, the decision of the trial judge will not be disturbed on this ground.

## B. Pattern of Racketeering

■ Defendants also claim that the trial judge's finding that a pattern of racketeering had been demonstrated was erroneous. As noted above, the term "pattern of racketeering" has not been narrowly defined. This is largely due to the immense number of factual scenarios that give rise to RICO claims and the inability of one definition adequately to address all possible situations. Nevertheless, the State was required to prove the presence of a pattern of racketeering beyond a reasonable doubt. This, defendants contend, the State failed to do. Defendants argue essentially that the State proved the existence of only one common scheme to defraud prospective automobile buyers and that each transaction was but a step in furtherance of that larger scheme. Analyzing the facts from this perspective, defendants claim, no pattern can be shown because there is only one racketeering activity at issue. This argument is without merit.

Defendants' argument, if accepted as true, would mean that any criminal enterprise could avoid RICO prosecution simply by limiting itself to one type of racketeering activity. This is clearly not what the General Assembly intended when it adopted the RICO statute. Rather, the statute should be read as viewing each transaction as a separate racketeering activity in the pattern. This reading reaches the heart of the drafter's intent: that a person who engages in a continuing pattern of illicit conduct is more culpable than a person who engages in one instance of that conduct.

The State urges adoption of the United States Supreme Court's definition of "pattern of racketeering" announced in *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). In *H.J. Inc.* the Supreme Court held that "a prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* at 239, 109 S.Ct. at 2900. Under this test, it is clear that the State has made the requisite showing. The acts engaged in by Stroik, Biddle and other agents of FSL clearly constituted a pattern of racketeering as envisaged by the drafters of RICO and the Supreme Court in *H.J. Inc.* The trial judge found ample record support for his determination and defendants point to no compelling reason to disturb that decision.

## VI. CONSPIRACY TO COMMIT RACKETEERING CONVICTION WAS SUPPORTED BY THE EVIDENCE

In their fifth assignment of error, defendants claim that the State introduced insufficient evidence at trial to support the trial judge's finding that both Stroik and Biddle were guilty of conspiracy to commit racketeering as defined by 11 *Del.C.* § 1503(d). Specifically, defendants contend that the State failed to meet its burden of demonstrating an agreement to participate in an enterprise through a pattern of racketeering as required under the standard announced by the United States Court of Appeals for the Sixth Circuit in *United States v. Joseph*, 6th Cir., 835 F.2d 1149 (1987).

[9] In *United States v. Joseph*, the Sixth Circuit held that, in order to establish a conspiracy to commit racketeering under the federal RICO statute, the prosecution must demonstrate the following elements beyond a reasonable doubt:

1. The existence of an enterprise . . .;
2. That the defendant was associated with the enterprise; and
3. That the defendant agreed to participate in the conduct of the enterprise's affairs through a pattern of racketeering activity.

*Joseph*, 835 F.2d at 1151.

■ Ample evidence was adduced at trial to demonstrate the existence of the first two elements of the *Joseph* test. As discussed, *supra*, the Superior Court found the existence of an enterprise demonstrated by the organizational, decisionmaking and operational complexity of FSL. While defendants have attempted to refute the existence of an "enterprise," this claim was discussed and rejected above. Further, there is little doubt that Stroik and Biddle were "associated" with FSL as contemplated under RICO.

Defendants were both principals in FSL, handling the bulk of its managerial responsibilities. The record shows that Stroik and Biddle were involved in at least some way in nearly every transaction engaged in by FSL. Defendants claim, however, that the third prong of the *Joseph* test was not met. Stroik and Biddle argue that any agreement they may have had merely constituted an agreement to commit the predicate acts of theft and therefore falls short of the *Joseph* requirement. This argument is without merit.

The *Joseph* court explained that the third prong of the test requires the presence of two agreements: (1) "an agreement to conduct and participate in the affairs of an enterprise" and (2) "an agreement to the commission of at least two predicate acts." *Joseph,* 835 F.2d at 1151 (quoting *United States v. Neapolitan,* 7th Cir., 791 F.2d 489, 499, *cert. denied,* 479 U.S. 940, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986)). The second agreement is clearly present as demonstrated by the more than 80 counts of theft on which Stroik and Biddle were convicted. Contrary to Stroik's and Biddle's position, however, the first agreement is also clearly present. The record amply demonstrates that FSL was designed and operated as a vehicle through which defendants could execute their fraudulent scheme. The pattern of theft, fraud and deception which ultimately led to this prosecution is bound up with, and inextricably linked to, the existence of FSL. This is precisely the situation RICO was intended to reach. The RICO Act was designed to punish those who make use of seemingly legitimate organizations to give effect to their criminal plans. The record clearly shows that Stroik and Biddle agreed to further the purposes of FSL and to use the company to effectuate their racketeering operation.

■ Defendants claim that RICO case law requires that the enterprise serve a function over and above the goal of a defendant's predicate acts. Essentially, they argue that since FSL only served to facilitate the theft of money by Stroik and Biddle, agreement to participate in FSL cannot constitute an agreement to participate in an enterprise through a pattern of racketeering. This argument fundamentally misconstrues the relevant RICO precedents. RICO does not require an agreement to commit other types of crime through the vehicle of an enterprise. All that RICO requires is an agreement to use the enterprise as a vehicle to effectuate the felonious schemes of the accused. Thus, it is not necessary to show that FSL served any purpose other than as a device designed to facilitate the theft of money from FSL clients.

## VII. NO MERGER OF THE OFFENSES OF RACKETEERING AND CONSPIRACY TO COMMIT RACKETEERING

Defendants' final assignment of error implicates the concept of merger of offenses. Defendants claim that their convictions for conspiracy to commit racketeering should merge with their convictions for racketeering under the principle of Wharton's Rule. Wharton's Rule essentially holds that, where the substantive offense encompasses the same elements as the conspiracy charge (*i.e.,* agreement between two or more people to commit a crime), the defendant should not be convicted of both crimes. Wharton's Rule has been codified in Delaware as 11 *Del.C.* § 521(c). *See Guyer v. State,* Del.Supr., 453 A.2d 462 (1982).

■ As the State correctly points out, Stroik's and Biddle's claim is wholly without merit. Violation of 11 *Del.C.* § 1503(a) does not require an agreement and can be achieved through the acts of one person. It is clear that 11 *Del.C.* § 1503(d), proscribing conspiracy to commit racketeering, contemplates a wholly separate offense that should not merge with offenses under § 1503(a). For this reason, Wharton's Rule is inapposite. Wharton's Rule is applied only in the context of an offense which requires two people for consummation. This is not the case under § 1503(a). Therefore, defendants' argument must fail.

Federal courts construing RICO have uniformly rejected the application of Wharton's Rule in this context. *See, e.g., United States v. Ohlson,* 9th Cir., 552 F.2d 1347 (1977). As the *Ohlson* court noted, Wharton's Rule is

**1344** 

most commonly applied in cases such as bigamy, dueling, incest or adultery which necessarily involve two people. *Id.* at 1349. RICO violations do not present a parallel case. Wharton's Rule is, therefore, irrelevant.

 Defendants alternatively argue that their sentences under §§ 1503(a) and (d) should be merged. This argument is also without merit. Merger of sentences is appropriate in cases where the victims of the two crimes for which the defendant is being sentenced are the same, and the harms occasioned by the two crimes are the same. In the case at bar, this is not true. Inchoate offenses such as conspiracy are punishable as separate offenses because of a legislative determination that conspiracy, in and of itself, is culpable conduct. To allow Stroik's and Biddle's argument to prevail would produce an irrational result and would mean that separate harm situations could result in only one punishment.

Stroik's and Biddle's actions through the instrumentality of FSL present precisely the type of conduct the General Assembly sought to proscribe when it enacted the Delaware RICO statute. The defendants employed the facade of a seemingly reputable business to defraud and manipulate the public. Through this instrumentality, they preyed on those with poor credit histories and few options. It is therefore appropriate that the defendants be made to account for their actions in a RICO prosecution.

Throughout the course of this complex and involved litigation, the Superior Court adhered to the dictates of the Delaware RICO statute in all respects, providing an ample explication of its reasoning as to each facet of the case.

## VIII. CONCLUSION

Defendants have failed to demonstrate any reason for this Court to disturb their convictions on appeal. The sentences of Stroik and Biddle are, therefore, **AFFIRMED.**