COURT OF APPEALS OF VIRGINIA


Present:    Chief Judge Felton, Judges Elder, Frank, Humphreys, Kelsey, McClanahan, Haley, Petty,
            Beales, Powell and Alston
Argued at Richmond, Virginia


LINDSAY ALAN BLY

                                                              OPINION BY
v.       Record No. 2948-07-3                   JUDGE ELIZABETH A. McCLANAHAN
                                                          SEPTEMBER 15, 2009
COMMONWEALTH OF VIRGINIA


                              UPON A REHEARING EN BANC

              FROM THE CIRCUIT COURT OF THE CITY OF BUENA VISTA
                            Humes J. Franklin, Jr., Judge

              Ross S. Haine, Assistant Public Defender, for appellant.

              Richard B. Smith, Special Assistant Attorney General (William C.
              Mims, Attorney General, on brief), for appellee.


        Lindsay Alan Bly was convicted in a bench trial of distributing an imitation controlled

substance and distributing methamphetamine, both in violation of Code § 18.2-248.  On appeal,

Bly contends the trial court erred in denying his motion for a new trial on the grounds that the

Commonwealth failed to disclose impeachment evidence concerning the confidential informant

who testified against him, in violation of Brady v. Maryland, 373 U.S. 83 (1963).  A panel

majority of this Court agreed with Bly and reversed the decision of the trial court.  We granted a

petition for rehearing *en banc* and stayed the mandate of the panel decision.  Upon rehearing *en

banc*, we affirm the trial court.

                                     BACKGROUND

        We review the evidence in the "light most favorable" to the Commonwealth as the

prevailing party below.  Commonwealth v. Hudson, 265 Va. 505, 514, 578 S.E.2d 781, 786

(2003) (citations omitted). That principle requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom." Kelly v. Commonwealth, 41 Va. App. 250, 254, 584 S.E.2d 444, 446 (2003) (*en banc*) (internal quotation marks and citations omitted).

Bly's two drug distribution convictions arose from an investigation conducted by the Rockbridge Regional Drug Task Force ("Task Force"), comprised of Investigators Slagle, McFaddin, Mays, and Conner. At that time, the Task Force was using Robert Hoyle, as a confidential informant, to make drug "buys" from individuals suspected of illegally selling controlled substances.

<u>May 17, 2004 Offense</u>

On May 17, 2004, as Investigator Slagle testified at trial, the members of the Task Force met with Hoyle in preparation for a purchase of cocaine from Bly. At the meeting, Slagle "thoroughly" searched Hoyle "to make sure he had no illegal contraband already on his person," and no money. After none of those items were found on Hoyle, he was given fifty dollars in "marked money" with which to make the purchase. The Task Force members then drove Hoyle to an area near the back of the apartment building in the City of Buena Vista where Bly lived. From that location, Slagle observed Hoyle walk to the back porch of the building. Slagle then saw Bly, who was standing on the back porch and "actually greeted" Hoyle upon his arrival. Slagle also saw Bly's wife standing on the back porch at the same time. Thereafter, Slagle watched Bly and Hoyle, along with Bly's wife, enter the back entrance of the apartment building together. Having been to Bly's apartment during a previous investigation, Slagle explained that Bly's apartment was the first one on the left from the back entrance of the building.

Slagle further testified that Hoyle was only in the apartment building "approximately three minutes." Upon exiting the building, Hoyle walked back to the vehicle where the Task Force members were waiting, and entered the vehicle. Hoyle then "produced a small bag of white powder" that "look[ed] like powder cocaine," and stated that he purchased it from Bly. Hoyle turned the contraband over to Investigator McFaddin. At that time, Slagle searched Hoyle for other contraband and money on his person and found none. Slagle later obtained a laboratory analysis of the "white powdery substance," which revealed it was an imitation, i.e., it contained no controlled substance.

Hoyle likewise explained in his testimony that on May 17, 2004, while working as a confidential informant for the Task Force, he purchased from Bly at Bly's apartment what was purportedly cocaine. He also reiterated that, beforehand, the Task Force members thoroughly searched him for drugs and money, none of which he had, and then delivered him to a location near Bly's apartment building. Hoyle further testified that he subsequently made the purchase of the contraband from Bly with money he received from the Task Force, that he was in and out of Bly's apartment building within approximately two to three minutes, that he immediately turned over to the Task Force the bagged substance he received from Bly, and that he was again searched.

<u>June 3, 2004 Offense</u>

Then on June 3, 2004, Investigators Mays and Conner met with Hoyle, as both of these investigators testified, for the purpose of arranging Hoyle's second drug "buy" from Bly, which was to be a methamphetamine purchase. At this meeting, Mays conducted a search of Hoyle for "money [and] narcotics" and found none. Mays explained that the search was not "just a pat-down." He "[went] into [Bly's] pockets, his pockets [were] emptied; his shoes [were] taken

off; his waistband, crotch area [were] checked; anywhere that [he] could feasibly hide something . . . [was] checked."

Mays and Conner then gave Hoyle one hundred dollars of "marked" money to make the purchase, and delivered him to an alley that led to Bly's apartment building. They watched Hoyle walk down the alley to the apartment building as they drove to a location directly behind the building. They next observed Hoyle enter the back of the apartment building, and then exit the building seven to eight minutes later. Hoyle returned to Mays' and Conner's vehicle, and handed Conner a small "baggie" containing a "pink, rock-like substance," which Hoyle said he purchased from Bly. Concluding the operation by conducting a final search of Hoyle, Conner "found no drugs on him." Laboratory analysis revealed that the baggie, in fact, contained methamphetamine, a Schedule I or II controlled substance.

Consistent with the testimony of Mays and Conner, Hoyle testified that on June 3, 2004, while still working as a confidential informant with the Task Force, he purchased "meth" from Bly at Bly's apartment. He also confirmed that, as with the earlier "buy," a member of the Task Force searched him beforehand, and gave him money to make the purchase. Hoyle further indicated he was not "surprise[d]" by the "actual Task Force numbers" that showed he was in Bly's apartment building "approximately seven minutes." Before entering Bly's apartment for this second "buy," Hoyle also explained, he walked upstairs and knocked on the apartment door of another resident with whom he was acquainted, but "[n]o one was there"—thus adding to the time he was in the apartment building.

Bly testified in his own defense, and denied even seeing Hoyle on either May 17, 2004 or June 3, 2004, after claiming to have specific recollection of those two days. In fact, Bly further stated that earlier in 2004 he told Hoyle to stay away from the apartment building where Bly

- 4 -

lived (which he also purportedly managed for his parents) or "I will be serving papers on you" and that Hoyle "complied."

When Bly was arrested on the drug distribution charges, he admitted to Investigator Slagle that he "buy[s] drugs" and "smoke[s] weed," but denied that he "sells any." He also admitted to Slagle that he occasionally "smokes dope, or weed, with his brother," who worked at Dana Corporation, during his brother's lunch hour. Bly was subsequently convicted, in a bench trial, on each of the drug charges, i.e., distributing an imitation controlled substance on May 17, 2004, and distributing methamphetamine on June 3, 2004, in violation of Code § 18.2-248.

Before being sentenced, Bly filed a motion to set aside the convictions and grant him a new trial. He contended in his motion that the Commonwealth, in violation of Brady, failed to disclose that Hoyle, while working for the Task Force as a paid informant in numerous cases, "was lying about at least some of the buys he was claiming to have made." In support of this allegation, Bly filed a copy of a letter, dated August 17, 2005, from the Commonwealth's Attorney for Rockbridge County to an attorney in another pending criminal case. The Commonwealth's Attorney represented in the letter that it was in response to defense counsel's motion for discovery and addressed information requested about Hoyle, in connection to his work with the Task Force. The letter specifically provided, in relevant part, as follows:

> Please treat this letter as my response to your Motion for Discovery and Inspection filed in the above captioned case . . . .
>
> Between January, 2004, and August, 2004, Robert Hoyle made a total of 83 controlled buys for the Drug Task Force in Rockbridge County and the City of Buena Vista. . . .
>
> \*     \*     \*     \*     \*     \*     \*
>
> With respect to paragraph F of your Motion, and some of which you already know, Hoyle alleged that he made purchases of controlled substances on June 15th and 16th, 2004 from [J.B.] in the South River Area of Rockbridge County. [J.B.] was charged by direct indictment, returned by the Grand Jury on November 1,

- 5 -

2004. [J.B.] was arrested on or about November 12, 2004, at which time it was discovered that he [J.B.] was in custody in the Rockbridge Regional Jail and could not have made the sale as alleged.

Investigator McFaddin advises that there was one other incident in which Hoyle purchased an illegal substance from someone he (Hoyle) identified as a certain individual in Buena Vista, Virginia. One of the Task Force Officers thought they may have seen that same individual in another location at the same time that Hoyle said he made the purchase. Hoyle was sent back to the location of the purchase to try to confirm his identification of the seller, but advised that no one came to the door. In this instance, no charges were ever placed against the suspect.

At the hearing on Bly's motion, Bly presented no additional evidence and made no proffer in support of his motion. He relied only on the contents of the above-stated letter for its purported impeachment value in challenging Hoyle's credibility. He contended the letter evidenced that Hoyle lied about purchasing drugs from at least two individuals—J.B. and an unidentified person. In arguing that the "sole issue" in the case was Hoyle's credibility, Bly's counsel asserted, wrongly, that no one other than Hoyle "testified at trial . . . that they saw Mr. Bly at [Bly's] residence when . . . Hoyle was sent in to buy drugs . . . ."[1] His counsel also advanced the following "theory" of Bly's innocence:

What we are alleging most likely happened is that Hoyle has secreted on his person somewhere, probably in his crotch, a little baggie of baking soda, or something along those lines, and he takes Task Force buy money, goes in, switches the baking soda for the buy money, puts the buy money in his crotch, walks back out and hands the Task Force baking soda, or does sell his own drugs.

In response, the Commonwealth's Attorney indicated that, "even though [he] didn't have actual knowledge"of the information in the letter regarding J.B., the information "should have

_____

[1] As explained, *supra*, Investigator Slagle testified that he saw Bly meet Hoyle at the entrance to Bly's apartment building at the time of Hoyle's first "drug buy" from Bly.

been disclosed" to Bly. He further asserted, however, that it would have made no difference in the outcome of the case. He proffered that the Task Force officers and the informant would testify that it was a "case of mistaken identity." As for the other reference in the letter to the unidentified individual that a Task Force officer "might have seen . . . in a different location," the Commonwealth's Attorney stated that this assertion was "so vague" that it "really amount[ed] to nothing." He also challenged Bly's contention that the sole issue at trial was Hoyle's credibility, in light of the Commonwealth's other evidence and the trial court's rejection of Bly's alibi defense based solely on his own testimony. Finally, in regard to Bly's theory of innocence, the Commonwealth's Attorney responded that it was "just pure fiction," given that there was no evidence to support it.

Recognizing that Bly had no prior criminal history and expressing concern over the fact that Hoyle was an informant in at least some cases that had been dismissed, the trial court took Bly's motion for a new trial under advisement and placed him on supervised probation. After Bly violated the terms of his probation, the trial court denied the pending motion and sentenced him to a term of imprisonment.

ANALYSIS

The principles on which a <u>Brady</u> violation is determined are well established. Under <u>Brady</u>, the prosecution's suppression of evidence favorable to an accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Brady</u>, 373 U.S. at 87. A "true <u>Brady</u> violation" consists of three components: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999). "Prejudice [is] defined as a 'reasonable probability that the

outcome of the proceeding would have been different had the evidence been disclosed to the defense.'" Deville v. Commonwealth, 47 Va. App. 754, 756-57, 627 S.E.2d 530, 532 (2006) (quoting Muhammad v. Commonwealth, 269 Va. 451, 510, 619 S.E.2d 16, 50 (2005)); see Strickler, 527 U.S. at 280; United States v. Bagley, 473 U.S. 667, 682 (1985).

Here, Bly relies on the nondisclosure of the information regarding Hoyle in the August 17, 2005 letter from the Rockbridge County Commonwealth's Attorney for advancing his Brady claim. Bly argues the information could have been used to impeach Hoyle and he was prejudiced without it. The Commonwealth, while conceding that the prosecution did not provide the information to Bly and that it was arguably favorable to him, contends Bly has failed to carry his burden of showing he was prejudiced by its nondisclosure.

"When an exculpatory evidence claim is reviewed '[o]n appeal, the burden is on appellant to show that the trial court erred.'" Gagelonia v. Commonwealth, 52 Va. App. 99, 112, 661 S.E.2d 502, 509 (2008) (quoting Galbraith v. Commonwealth, 18 Va. App. 734, 739, 446 S.E.2d 633, 637 (1994)). Based on our review of the record, along with the Commonwealth's concession, it is evident Bly has established the second component of a Brady violation—the prosecution's nondisclosure of the disputed information. Assuming, *arguendo*, Bly has also established the first component, i.e., that the information was favorable impeachment evidence,[2] we conclude he has failed to establish prejudice, the third component of Brady.

---

[2] We do not decide whether the information in the letter was admissible impeachment evidence, see Gamache v. Allen, 268 Va. 222, 229, 601 S.E.2d 598, 602 (2004) (addressing what constitutes impeachment evidence), and, if not, whether Bly established that it would lead to admissible impeachment or exculpatory evidence, see Workman v. Commonwealth, 272 Va. 633, 648, 636 S.E.2d 368, 377 (2006) (addressing the requirement to at least "proffer[] admissible evidence that would have been discovered" had defendant known of the undisclosed information in a timely manner). See also Wood v. Bartholomew, 516 U.S. 1, 5-6 (1995); Soering v. Deeds, 255 Va. 457, 465, 499 S.E.2d 514, 518 (1998).

The trial court rejected Bly's <u>Brady</u> claim when it denied his motion for a new trial, and then sentenced him on his two drug convictions from his bench trial. "'Absent clear evidence to the contrary in the record, the judgment of a trial court comes to us on appeal with a presumption that the law was correctly applied to the facts.'" <u>Caprino v. Commonwealth</u>, 53 Va. App. 181, 184, 670 S.E.2d 36, 37-38 (2008) (quoting <u>Yarborough v. Commonwealth</u>, 217 Va. 971, 978, 234 S.E.2d 286, 291 (1977)); <u>see</u> <u>Groves v. Commonwealth</u>, 50 Va. App. 57, 61-62, 646 S.E.2d 28, 30 (2007) ("This means the 'judge is presumed to know the law and apply it correctly in each case.'" (quoting <u>Crest v. Commonwealth</u>, 40 Va. App. 165, 172 n.3, 578 S.E.2d 88, 91 n.3 (2003))). Bly points to no such evidence in the record to rebut this presumption. Thus, for purposes of this appeal, we presume the trial court correctly applied the principles dictated by <u>Brady</u> and made a factual determination that Bly was not prejudiced by the Commonwealth's nondisclosure of the information regarding Hoyle set forth in the August 17, 2005 letter. <u>See</u> <u>Deville</u>, 47 Va. App. at 757-58, 627 S.E.2d at 532 (explaining that the trial court's "no prejudice" determination under <u>Brady</u>, following appellant's bench trial, was a factual finding).

Accordingly, here, as in <u>Deville</u>, where "a trial judge, sitting as 'both trier of fact and arbiter of law,' finds the <u>Brady</u> evidence inconsequential, there can be 'no logical possibility' that its earlier disclosure 'would have altered the outcome of the case.'" <u>Id.</u> at 757, 627 S.E.2d at 532 (quoting <u>Stroik v. State</u>, 671 A.2d 1335, 1340 (Del. 1996)). That is because, "[u]nder such circumstances, we need not hypothesize how a reasonable jury would likely have reacted to the new information. We know with certitude, from the factfinder himself, that the outcome of the proceeding would not have been different had the evidence been disclosed earlier." <u>Id.</u> However, as further explained in <u>Deville</u>, "a trial court cannot foreclose appellate review by an *ipse dixit* denial of prejudice. Just as the original finding of guilt must fail if no 'rational trier of fact' could have made such a finding, so too the factual finding of no prejudice should be set

aside if patently unreasonable." Id. (internal citations omitted). From our review of the record in this case, we cannot say the trial judge's presumptive finding that Bly was not prejudiced by the Commonwealth's failure to disclose the information regarding Hoyle was patently unreasonable.

At Bly's trial, the court heard not only the testimony of Hoyle regarding his "drug buys" from Bly at Bly's apartment on May 17, 2004 and June 3, 2004 while working as a confidential informant for the Task Force, the court also heard the testimony of three Task Force members, Investigators Slagle, Mays, and Conner, who were directly involved with those "buys." According to the investigators' testimony, Hoyle was thoroughly searched for drugs and money both before and after each of the transactions between Hoyle and Bly, which included a search of Hoyle's crotch. During the intervening period, Hoyle was only out of the Task Force members' sight for the brief period he was in Bly's apartment building making a "drug buy," which was no more than three minutes during the first transaction and eight minutes during the second transaction. Investigator Slagle also testified that, at the time of the first transaction, he actually saw Bly "greet" Hoyle on the back porch of Bly's apartment building before Bly, along with Bly's wife, escorted Hoyle into the building.

The trial court also heard Bly testify in his own defense, during which he unequivocally denied even seeing Hoyle at Bly's apartment building on either May 17, 2004 or June 3, 2004, and claimed to have been somewhere else when the meetings with Hoyle were to have occurred. Bly further testified that earlier in 2004 he had directed Hoyle to stay away from the apartment building where Bly lived (which he purportedly managed) and that Hoyle "complied." At least as to the events of May 17, 2004, Bly's testimony was directly contrary not only to Hoyle's testimony, but to that of Investigator Slagle, as well. As fact finder, the trial court was entitled to disbelieve Bly's self-serving testimony and conclude that he was "lying to conceal his guilt." Commonwealth v. Duncan, 267 Va. 377, 385, 593 S.E.2d 210, 215 (2004); Shackleford v.

- 10 -

Commonwealth, 262 Va. 196, 209, 547 S.E.2d 899, 907 (2001); Marable v. Commonwealth, 27 Va. App. 505, 509-10, 500 S.E.2d 233, 235 (1998).

Furthermore, there was no evidence presented in this case to support Bly's theory that Hoyle had either drugs or baking soda of his own hidden in his crotch the two times he allegedly met with Bly to buy drugs and that he then produced the hidden substance to the Task Force when he returned from each of the alleged transactions—with Hoyle having made no actual purchase of drugs or an imitation substance from Bly on either occasion. "'The Commonwealth need only exclude reasonable hypotheses of innocence that flow from the evidence, not those that spring from the imagination of the defendant.'" Ward v. Commonwealth, 47 Va. App. 733, 751, 627 S.E.2d 520, 529 (2006) (quoting Hamilton v. Commonwealth, 16 Va. App. 751, 755, 433 S.E.2d 27, 29 (1993)).

Finally, we do not view the trial judge's comments during the hearing on the motion for a new trial, acknowledging Bly's lack of a criminal history and the dismissal of cases where Hoyle was an informant, as undermining the validity of the trial judge's denial of the motion. To do so, in view of the totality of the record here presented, would be to "fix upon isolated statements of the trial judge taken out of the full context in which they were made, and use them as a predicate for holding the law has been misapplied," which we will not do. Yarborough, 217 Va. at 978, 234 S.E.2d at 291.

## CONCLUSION

Upon our review of both the evidence presented at trial and the undisclosed information in dispute, we conclude the trial court reasonably rejected Bly's Brady claim. The trial court, therefore, did not err in denying Bly's motion for a new trial. Accordingly, we affirm Bly's convictions.

Affirmed.

- 11 -

Frank, J., with whom Humphreys, Petty, Haley and Alston, JJ., join, dissenting.

I do not agree that appellant failed to demonstrate a <u>Brady</u> violation. Therefore, I respectfully dissent from the analysis and judgment in this case.

"A <u>Brady</u> violation occurs when the government fails to disclose evidence materially favorable to the accused." <u>Youngblood v. West Virginia</u>, 547 U.S. 867, 869 (2006) (citing <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963)). The United States Supreme Court has held that <u>Brady</u> obligations extend not only to exculpatory evidence, but also to impeachment evidence, <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985), and that a <u>Brady</u> violation exists even when the government fails to divulge evidence that is "known only to police investigators and not to the prosecutor," <u>Kyles v. Whitley</u>, 514 U.S. 419, 438 (1995). "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." <u>Id.</u> at 437.

"There are three components of a true <u>Brady</u> violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999). Prejudice is shown, and the conviction must be reversed, "'if the evidence is material in that its suppression undermines confidence in the outcome of the trial.'" <u>See</u> <u>Garnett v. Commonwealth</u>, 49 Va. App. 524, 534, 642 S.E.2d 782, 787 (2007) (quoting <u>Bagley</u>, 473 U.S. at 678).

The majority states that appellant has established the second component of a <u>Brady</u> violation and assumes, *arguendo*, that he has also established the first. The only component at issue, therefore, is the third – whether prejudice ensued. Prejudice is "'a reasonable probability that the outcome of the proceeding would have been different had the evidence been disclosed to

the defense.'" Deville v. Commonwealth, 47 Va. App. 754, 756-57, 627 S.E.2d 530, 532 (2006) (quoting Muhammad v. Commonwealth, 269 Va. 451, 510, 619 S.E.2d 16, 50 (2005)).

The majority relies upon the concept that the "judge is presumed to know the law and apply it correctly in each case." Crest v. Commonwealth, 40 Va. App. 165, 172 n.3, 578 S.E.2d 88, 91 n.3 (2003). The majority reasons that the trial court, by denying appellant's motion for a new trial, made a factual determination that appellant was not prejudiced by the nondisclosure. To the contrary, an examination of the record demonstrates that the trial judge did express his concerns as to the prejudice suffered by appellant.

While the majority concludes the trial court found no prejudice, its pronouncement at the hearing on appellant's motion for a new trial on March 30, 2006 belies the majority's position.

The trial court stated:

> [o]ne of the things that really bothers me about it, this man doesn't even have a traffic ticket. Have you looked at his criminal history? He doesn't even have a traffic ticket. I mean, he's got nothing. If they did a presentence on me, I'd have – I'd have traffic tickets in my background. This man doesn't have anything, and we're getting ready to hang two felonies on him, on the word of a man that, you know, we dismissed some cases.

After making this statement, the trial court continued the hearing without ruling on the Brady issue and took the matter under advisement. This demonstrates a clear lack of confidence in the verdict. The trial court was obviously concerned about the reliability of Hoyle's testimony.

The evidence did not change, and no new information came to light, in the interim period after this hearing. The only development before the hearing on October 24, 2007, some nineteen months later, was that appellant tested positive for marijuana. At the second hearing, appellant's counsel inquired about the procedural status of the case. The trial court responded: "I took the

matter under advisement, didn't find him guilty,[3] gave him a chance to do right . . . so basically if he's in violation today, we're going to end up with a sentencing hearing is what we're going to end up with."

Appellant's probation officer testified that appellant had not kept in contact with her and had tested positive for marijuana. Hearing that testimony, and with no explanation, the trial court then denied appellant's motion for a new trial. Appellant's counsel attempted to explain that appellant's behavior while the motion was under advisement was unrelated to the issue underlying the motion for a new trial. Counsel stated "what's happened post-March thirtieth should not affect the grounds raised in the Motion for New Trial." The trial court interrupted and said, "we're here on more than that. I mean, we've still got to dispose of those two distribution charges." Appellant's counsel was not prepared to go forward on sentencing at this hearing on his motion for a new trial, so the trial judge continued the sentencing and stated, "[t]he record will show I'm overruling your motion for a new trial."

The majority devotes much attention to other evidence that corroborates Hoyle's testimony. However, it is important to note that the trial court in its statements of March 30, 2006, indicated the convictions were based solely on Hoyle's testimony. If the trial court considered corroborating testimony, it would not have stated, "we're getting ready to hang two felonies on [the defendant], on the word of a man that . . . we dismissed some cases." It is apparent the trial court did not consider corroborating evidence.

The majority relegates the trial court's statements of March 30, 2006 as isolated statements. In order to sustain the majority view, it must, and did, ignore the significance of those statements. To the contrary, the trial court's expressed concern was the very reason why it

_____

[3] It appears appellant was found guilty of the offenses on March 24, 2005, but the conviction order is not part of the record.

did not sentence appellant on March 30, 2006, why it put appellant under supervision and continued the case, and why it gave appellant "a chance to do right."

On October 24, 2007, when the trial court denied appellant's motion for a new trial, it expressed its frustration with appellant for not taking advantage of the "break" afforded him by the trial court.

It is clear from an examination of the record appellant's motion was denied, not because, as the majority speculates, the trial court made a factual finding of no prejudice, but because appellant failed to successfully complete supervision. After the March 30, 2006 hearing, the trial court never again addressed the merits of the Brady violation, other than to deny the motion without explanation.

The record is completely devoid of any evidence that the trial court considered the nondisclosed evidence and indicated that it would have reached the same conclusion with the evidence. This is markedly different from the facts in Deville, 47 Va. App. at 756, 627 S.E.2d at 531-32, where the trial judge stated, unequivocally and on the record, that the nondisclosed evidence would not have made such a difference as to create any prejudice. In that case, this Court stated that there is no prejudice when "'the trial judge was the trier of fact and, upon learning of the undisclosed information,' rules unequivocally that the impeachment evidence 'would have had no impact' on the factfinding underlying the defendant's conviction." Id. at 757, 627 S.E.2d at 532 (quoting Correll v. Commonwealth, 232 Va. 454, 466, 352 S.E.2d 352, 359 (1987)). This Court went on to say that "[w]hen a trial judge, sitting as 'both trier of fact and arbiter of law,' finds the Brady evidence inconsequential, there can be 'no logical possibility' that its earlier disclosure 'would have altered the outcome of the case.'" Id. (quoting Stroik v. State, 671 A.2d 1335, 1340 (Del. 1996)).

> [A] trial judge's denial of a Brady motion to vacate a conviction –
> *if predicated on an unequivocal finding of no prejudice in a bench*

> *trial* – produces a result conceptually no different from that which would follow the granting of the motion, a reopening of the evidentiary record for the new evidence to be admitted, and a reinstatement of the earlier conviction order.

Id. (emphasis added). However, unlike in Deville, the trial judge in the instant case made no such finding. There is no evidence in the record that the trial judge found no prejudice to appellant. To the contrary, he expressed doubt as to the veracity of the informant, which undermines confidence in the verdict.

Clearly, the trial court was bothered by the Commonwealth's failure to disclose the evidence regarding the informant. In fact, at the March 30, 2006 hearing, the trial court expressed enough concern about Hoyle's veracity that rather than sentencing appellant, the trial court took the matter under advisement and placed appellant under supervision. At the next hearing on October 24, 2007 (approximately one and a half years later), the trial court overruled appellant's motion for a new trial. However, the trial court was uncomfortable with the veracity of the informant, and it never retreated from that position. The trial court's own words from the March 30, 2006 hearing cast doubt on the reliability of its own verdict.

The Commonwealth failed to disclose material information that was favorable to appellant. This nondisclosure prejudiced appellant and undermines confidence in the outcome of his trial as was implied by the trial court. For these reasons, I would conclude that the trial court erred in refusing to grant appellant a new trial. I therefore respectfully dissent.